WHEELON, Plaintiff, v. SOUTH DAKOTA LAND SETTLE-
MENT BOARD et al, Defendants.

(181 N. W. 359)

(File No. 4827.   Opinion filed January 28, 1921.)

1.  Statutes—Title, Land Settlement Board Act—Words "State,"
    "Establishing, Maintaining," Superfluous Language—Further
    Unnecessary Language—Non-necessity of Index in Title—Con-
    stitution.

    The title to Chap. 315, Laws 1919, entitling same as an act
    "establishing and maintaining by the state of South Dakota a
    Land Settlement Board and defining its powers and duties,"
    with further descriptive language, is superfluous in containing
    the words "by the state of South Dakota;" and while the word
    "creating" might have been substituted for words "establishing
    and maintaining," yet the title, had it stopped there, would not
    have been obnoxious to constitutional provision in Art. 3, Sec.
    21, providing that no law shall embrace more than one sub-
    ject, which shall be expressed in its title, since (following
    State v. Morgan, 2 S. D. 32,) the title need not be an index
    of contents of an act.  Held, further, that further language in
    said title, concerning purchase and sale of real and personal
    property, loaning of money by state to settlers, authorizing
    state to borrow money on warrants and bonds secured by good
    faith and credit of state for said purpose, providing for man-
    agement of said board and appropriating moneys therefor, was
    unnecessary.

2.  Same—Declaring An Emergency, Immateriality Re—Whether
    Date of Taking Effect is Part of Subject.

    Likewise, the last clause of said title "and declaring an em-
    ergency," is particularly unnecessary, since the time at which
    an act shall take effect is no part of the subject thereof.

3.  Same—Purchase, Sale, of Property, Loaning State Money to
    "Settlers," Body of Act Making Soldiers, Etc., Prior Benefi-
    ciaries, Whether Title Misleading—Liberal Constitutional Con-
    struction—Title Not Clearly Misleading.

    The fact that the title to said act refers to purchase and sale
    of property and loaning of state money to "settlers," while it
    provides. in its body for priority benefits to soldiers, sailors and
    marines, and others who have served with armed forces of the
    United States in the European war or other wars of the United
    States, etc., including former American citizens who served in
    allied armies against the Central Powers and have been repat-
    riated—does not render the title misleading; since the word
    ."settlers" indicates intention to aid all persons who settle

upon land in this state, while by the terms of the act war-service persons have priority, and the benefits of the act may be extended to other persons only "when there are no qualified soldier applicants;" the rule of constitutional construction being that of liberality, and only when conflict between statute and construction is plain and manifest are courts justified in declaring the act unconstitutional; and it does not clearly appear that one examining the title would be misled thereby.

4.   Taxation—Taxation For Providing Employment, Funds, Loans, Rural Homes, For Soldiers, Etc., Whether Taxation For Public Purposes—Constitution Re Taxes, Suppressing Insurrection, Etc., Repelling Invasion, Etc.

Laws 1919, Chap. 315, providing in effect for useful employment, and rural homes, for soldiers, sailors and marines, and others having served in our national armies in various wars, in recognition of military service, and for state loans upon lands and personalty to such soldiers, etc., and for sales of land by state to them, and providing, through the Tax Commission, for an annual tax levy on all taxable property in the state to pay the interest and principal of the state bonds therein provided for—is not violative of Const., Art. 11, Sec. 2, declaring that taxes shall be levied and collected for public purposes only; since such benefits do not constitute a personal gratuity or donation which cannot be supported under the war and defense clauses of the Constitution (Art. 12, Sec. 3, re proviso concerning expenditures in suppressing insurrection, etc.; Art. 13, Sec. 2, re exception to debt limitation for repelling invasion, etc.)

5   States—State Promotion of Land Settlement, Whether Private, Or Public, Purpose—Whether Taxation Is Violative of Constitution—Reasons For Encouraging Land Settlement and State Growth, Stated.

The declared purposes of Laws 1919, Chap. 315, being to provide useful employment and rural homes for soldiers, sailors and marines and others who have served in our national armies in various wars, and to that end to loan state funds to them on real and personal security, to sell lands to them, etc., an in effectuating these ends, to levy an annual state tax on all taxable property in the state to pay interest and principal of the incidental bonded debt; held, that such purposes and taxation to effectuate same, are public, not private, in character; this in light of the fact that keeping people on land in the future is one of the main endeavors of civilized nations, that people cannot be kept there where non-resident ownership and tenantry prevail, that people who farm must be enabled to own land, that the principal source of wealth of this state is agriculture, upon which all other business rests, that state, county and town

have an interest at stake where farms are scattered and incidental public improvements excessive in cost, and educational facilities, etc., or organized society, are less than where settlement is closer, that the question whether this manner of raising and expending funds for such purposes is not one of exclusive legal logic but of policy and wisdom determinable in light of present and future public welfare, that after Legislature and the Executive have decided that the purpose for which a tax is laid is public, nothing short of moral certainty that a mistake has been made warrants the court in overruling such decision, that as times change, what was a public use a century ago may have ceased to be such, and vice versa, that development of our unoccupied agricultural lands by encouraging settlement of home-owning farmers will materially contribute to the welfare of the whole people while making for better citizenship, better notions of necessity for law and order, and sounder and saner patriotism.

6.  Same—Promotion of Land Settlement By State, Whether Express Constitutional Authority Necessary.

That there is no constitutional authority of the state to engage in the business of promoting the settlement and development of land and rural homes, as provided in Laws 1919, Chap. 315, is inclusive; there need be no express constitutional authority, such legislation being lawful unless prohibited by constitution.

7.  Same—Constitution Authorizing State Engagement In "Internal Improvement," and Conducting "Business Enterprises"— Whether Land Improvement A "Business Enterprise."

Since Const., Art. 13, Sec. 1, as amended in 1918 provides that for purposes of developing resources and improving economic facilities of this state, it "may engage in works of internal improvement, may own and conduct proper business enterprises," it is unnecessary, in determining whether Laws 1919, Chap. 315, contemplates a work of internal improvement, since it is clearly a business enterprise tending to development of state resources.

8.  Constitutional Law—Class Legislation—State Promotion of Land Settlement To Soldier Beneficiaries, Whether Special Privileges Or Immunities—Whether Violative Of Federal Amendment Re Equal Protection.

Laws 1919, Chap. 315, providing for state promotion of agricultural land settlement and improvement for the benefit of war-service persons and others, etc., is not violative of Const., Art. 6, Sec. 18, providing that no law shall be passed granting to any citizen, class of citizens * * privileges or immunities, which on the same terms shall not equally belong to all citizens,

etc.; nor would it transcend said provision were it limited to war-service persons (following State ex rel. Morris v. Handlin, 38 S. D. 550;) nor is said act obnoxious to the objection that it violates Amendment 14 of Federal Constitution concerning equal protection of the law.

**9.    Taxation—Whether Act Violative Of Constitution Re Due Process—Taxation Properly Exercised, Justified.**

Nor is said act violative of Const., Art. 6, Sec. 2, prohibiting deprivation of life, etc., without due process of law; since taking of property under proper exercise of taxing power is not a taking thereof without due process.

**10.    Same—Act, Whether Violative of Const. Re Taking Property Without Compensation—Eminent Domain Not Taxing Power.**

Nor does said act transcend Const., Art. 6, Sec. 13, prohibiting taking of private property for public use without just compensation; said constitutional provision not relating to taxing power, but to power of eminent domain.

**11.    Same—Act, Whether Violative of Const. Re Unequal, Non-Uniform Taxation.**

Said act is not inhibited by Const., Art. 6, Sec. 17, providing among other things that all taxation shall be equal and uniform.

**12.    Same—State Promotion of Land Settlement, Bonded Debt Therefor, Whether Exceeding Constitutional Debt Limit—Cognate Constitutional Provisions Construed.**

Laws 1919, Chap. 315, authorizing state to provide useful employment and rural homes for soldiers, sailors and marines, and others who have served in our national armies in various wars, and authorizing issue of state bonds to raise funds to loan to said soldiers, etc., and to provide lands for sale to them, and authorizing an annual tax levy on all taxable property to pay interest and principal of such bonded debt, does not transcend Const., Art. 13, Sec. 2, limiting state indebtedness, including previous debts, in the aggregate to $100,000., except for purpose of repelling invasion, etc.; since by specific terms of Sec. 1, such $100,000. debt limit is inapplicable to debt incurred under that section, which provides that debt limit in Sec. 2 shall not apply to provisions of Sec. 1, but that state indebtedness for purposes of latter section, other than for rural credits, shall never exceed one-half of 1% of assessed valuation of property of state; it being admitted that the indebtedness incurred under Sec. 1 (other than for rural credits) and to be incurred by the proposed bond issue of $250,000, will be well within limit specified in Sec. 1.

**13.    Constitutional Law—Aliens—Aliens and Citizens, Non-Distinction**

Under Constitution—State Land Settlement Promotion, Citizen and Resident Alien Soldiers Beneficiaries, Act, Whether violative of Constitution—Unrepatricated Soldiers, Non Necessity of Determining Constitutionality of Act—Act As Whole Sustained, Writ of Prohibition Against Land Settlement Bond Issue Denied.

Laws 1919, Chap. 315, wherein it provides for state promotion of agricultural land settlement by providing useful employment and rural homes for soldiers, sailors and marines, and others who have served with armed forces of the United States in the European and other wars, including former American citizens who served in allied armies against Central Powers, and have been repatriated and honorably discharged, is not violative of Const, Art. 6, Sec. 14, providing that no distinction shall ever be made by law between resident aliens and citizens, in reference to possession, enjoyment, or descent of property; said act being primarily for benefit of such honorably discharged soldiers, etc., and, secondarily, for benefit of "other persons," thus creating no distinction between resident aliens and citizens; while American citizens who served, etc., are included in the priority class if repatriated, while if unrepatriated they are still within operation of the act as "other persons" after the list of "soldier applicants" is exhausted. And such objection goes rather to constitutionality of the restriction against returned war-service persons, who served, etc., and are not repatriated, such restriction being separable; and being separable from the other provisions of the act; no necessity exists for determining that question until one of such persons raises it. Held, further, that, finding no constittuional provision that is or will be violated by said chapter unless it be the one last mentioned, application for writ of prohibition against issuance of the proposed bonds is dismissed upon merits.

Original proceeding by Albert Wheelon, for himself and in behalf of all other property owners similarly situated, against the South Dakota Land Settlement Board and others, for a writ of prohibition against defendant Board and officers, prohibiting them from issuing state bonds by said Board pursuant to Laws 1919, Chap. 315. Writ denied.

*Chas E. DeLand,* for Plaintiff.

*Byron S. Payne,* Attorney General, and *E. R. Winans,* Assistant Attorney General, for Defendants.

*Charles B. Wood* and *Horace S. Oakley,* Amici Curiae.

(1) Under point one of the opinion, Plaintiff submitted that: A member of the legislature, or any person in the state

reading a report of this act as gathered from its title, would not regard its purpose as being one to benefit only certain classes of persons such as mentioned in its body, but would regard it as a bill intended to give any and all persons who might seek land and its improvement as "settlers," as equally within its benefits and purposes. And cited: Standard Dictionary, "Settler"; Black's Law Dictionary; 27 Minn. 282; Davis v. Young, 32 Ky. (2 Dana) 299. To point that this title is misleading as to contents of act, plaintiff cited: State v. Morgan, 2 S. 32; Kennedy v. R. R. Co. 28 S. D. 94.

(5)   To point five, Plaintiff cited: Const., Art. 10, Sec. 2; Art. 11, Sec. 2; MacKey v. Reeves, (S. D.) 175 N. W. 359.

Defendant cited: State ex rel. Morris v. Handlin, 38 S. D. 550; Schaaf v. Rural Credits Board, 164 N. W. 964; Opinions of the Judges, (S. D.) 162 N. W. 536; 177 N. W. 812; Green et al v. Frazier et al, (U. S.) 40 Sup. Ct. Rep. 499; Opinion of Judges (N. D.) 176 N. W. 11.

Counsel as amici curaie cited: Estate Ex Rel. v. Handlin, 38 S. D. 550; 162 N. W. R. 379; Scott v. Frazier, 258 Fed. R. 678; Green v. Frazier, (N. D.) 176 N. W. R. 11-18; State ex rel. v. Johnson, (Wis.) 175 N. W. R. 589; State ex rel. v. Johnson, (Wis.) 176 N. W. R. 224; State v. Claussen, (Wash.) 188 Pac. R. 538; Sun Publishing Co. v. Mayor, 40 N. Y. Sup. 607; Laws Idaho, 1919, Ch. 24; Laws Montana, 1919, Ch. 201; Laws Missouri, 1919, p. 705; Laws New Mexico, 1919, Ch. 127; Laws North Carolina, 1919, Ch. 266; Laws Oregon, 1919, Ch. 303; Laws Tennessee, 1919, Ch. 140; Laws Utah, 1919, Ch. 106; Laws Wyoming, 1919, Ch. 143.

(7)   To point seven, Defendant cited, re "internal improvements": 6 Am. Eng. Ann. Cas. 318; Osborne v. Adams County, 106 U. S. 181.

(8)   To point eight, Defendant cited: State Ex Rel. Morris v. Handlin, 38 S. D. 550; 162 N. W. 379; Goodrich v. Mitchell, (Kan.), 75 Pac. 1034; 64 L. R. A. 945; 1 Ann. Cas. 228; Shaw v. Marshalltown, (Ia.), 104 N. W. 1121; 10 L. R. A. (N. S.) 835; 9 Ann. Cas. 1039; Thurber v. Duckworth, (Ia.) 147 N. W. 158; Green v. Frazier, 40 Sup. Ct. Rep. 499.

(9)     To point nine, Defendant cited: 12 C. J. 1255, 1190, 1195.

(11)   To point eleven, Plaintiff cited: Bailey v. Sioux Falls, 28 S. D. 118.

Defendant cited: 37 Cyc. 729.

GATES, J.   This is an original proceeding in this court in which is sought a writ of prohibition against the issuing of bonds to the amount of $250,000 by the South Dakota Land Settlement Board pursuant to the provisions of chapter 315, Laws 1919.   The sole basis of the proceeding is the alleged unconstitutionality of that act.   It having been made to appear that bonds aggregating $200,000 had previously been sold to a bank in Chicago, Ill., notice of this proceeding was given to said bank, and an invitation given to appear or to have a brief filed as amicus curiæ. Pursuant thereto Messrs. Wood & Oakley, attorneys of Chicago, Ill., have filed brief as amici curiæ.

[1]It is asserted by plaintiff that the title of said act violates section 21, art. 3, of our Constitution, which reads as follows:

"No law shall embrace more than one subject which shall be expressed in its title."

Said title begins as follows:

"An act entitled, an act establishing and maintaining by the state of South Dakota a Land Settlement Board and defining its powers and duties."

[1]   While the words "by the state of South Dakota" were superfluous, and the word "creating" might well have been substituted for the words "establishing and maintaining," yet, if the title had stopped there, it would not have been obnoxious to the above constitutional provision.   This court declared in State v. Morgan, 2 S. D. 32, 48 N. W. 314, that the title need not be an index of the contents of an act, and such suggestion has many times been reiterated by this court, but apparently to no effective purpose.   The further clauses of the title in question are:

"Providing for the purchase and sale of real and personal property and the loaning of money by the state of South Dakota to settlers; authorizing the state of South Dakota to borrow money on its warrants and bonds secured by the good faith and credit of the state for the purposes authorized by this act; providing for the management of said board and providing for an appropriation of one hundred thousand dollars to be used by the Land Settlement Board for the purposes authorized by this act

and for the payment of salaries, expenses and equipment, and declaring an emergency."

[2, 3] These are all unnecessary, particularly the last clause "and declaring an emergency"; the last for the reason that the time at which an act is to go into effect is no part of the subject of the act. The question then recurs whether by the insertion of needless matter in the title it has become misleading. State ex rel. Gabel v. Young, 37 S. D. 196, 157 N. W. 325. The only possible ground of attack is, in our opinion, to be found in the word "settlers." That word would indicate an intention to aid all persons who settle upon land in this state, while by the terms of the act war service persons are given the priority, and the benefits of the act may be extended to other persons only "when there are no qualified soldier applicants." In view of the principle that it is our duty to construe this section of the Constitution liberally (Stephens v. Jones, 24 S. D. 97, 123 N. W. 705), and that it is only when "the conflict between the statute and Constitution is plain and manifest" that courts will be justified in declaring an act unconstitutional (State v. Morgan, supra; Queen City Fire Ins. Co. v. Basford, 27 S. D. 164, 130 N. W. 44), we conclude that it does not clearly appear that a person examining the title would be misled thereby.

[4, 5] The act is assailed because it is claimed that the taxes levied for its purposes will not be levied for a public purpose, and therefore that the clause of Const. art. 11, § 2, will be violated which declares: "Taxes * * * shall be levied and collected for public purposes only." It is argued that, in so far as the benefits of the act relate to war service persons, it is a personal gratuity or donation, and cannot be supported under the war and defense clauses of the Constitution. This contention is no longer an open question in this state. The decision in State ex rel. Morris v. Handlin, 38 S. D. 550, 162 N. W. 379, forecloses such contention. See, also, State ex rel., Atwood v. Johnson, 170 Wis. 218, 175 N. W. 589, 7 A. L. R. 1617, and State ex rel. Atwood v. Johnson, 170 Wis. 251, 176 N. W. 224. It is further argued that, in so far as the act promotes land settlement, it deals with a private and not with a public purpose. Unlike the Hydro-electric Act, Laws 1919, c. 225 (In re Opinion of the Judges, 177 N. W. 812), and the State Cement Commission Act, Laws 1919,

c. 324 (In re Opinion of the Judges, 180 N. W. 957), the Land
Settlement Act is not provided for by specific language of the
Constitution.   Is then the promotion of land settlement a public
purpose?  In his work "Helping Men Own Farms" Prof. Elwood
Mead says on page 10:

"We are only just beginning to realize that our future is
likely to be determined primarily by the relation of the people to
the land.   The chaos of Russia has grown out land hunger;
no one fears for the safety of France where nearly half of the
people are landowners.   We have often stated, but little heeded,
the facts that we are ceasing to be a land-owning nation, and that
the land-born are drifting to the cities.   We have yet to learn
what the older countries of the world already know—that keeping
people on the land in the years to come must be one of the main
endeavors of civilzed nations.   People cannot be kept on the land
where nonresident ownership and tenantry prevail.   Nothing short
of ownership of the land one toils over will suffice to overcome
the lure of the city.   At any sacrifice, at any cost, the people who
farm the land must be enabled to own it.   On such ownership
the life of a modern nation may depend."

The writer well remembers that Dr. Joseph Cook in his
"Boston Monday lectures" of about 40 years ago gave frequent
and timely warning of the danger to the country of the influx of
the people from the farms to the cities, and he often reiterated
the statement that then nearly two-fifths of the population of this
country resided in cities.   By the census announcement made a
few days since it appears that now more than 51 per cent. of
the population reside in cities of 2,500 or more population.   Surely
this tendency must be counteracted if this country is to continue
to exist upon the foundations laid by our forefathers.

In Green v. Frazier (N. D.) 176 N. W. 11, 18, Mr. Justice
Grace, speaking for the court of our sister state, said:

"The principal source of the production of wealth of North
Dakota is agriculture.   It is a conservative estimate that 90 per
cent. of the wealth produced by the state is from agriculture.   It
is the foundation of the state's prosperity and welfare, and upon
it, as such, rests all other business of the state.   The mercantile
pursuits, the banking interests, and every business pursuit within
the state depends directly for its success upon the wealth pro-

duced by the farmers of this state. The wealth produced by the farmers of this state is the lifeblood of the business interest of the state; hence the conservation and securing of the wealth produced by the farmers to them is of vital interest not only to the farmers, but to every one who is engaged in the carrying on of business in the state."

With the exception of the mining industry in the Black Hills, the like statement might be made as to South Dakota. South Dakota has about 49 million acres of land, and it is authoritatively stated that less than 17 million acres are under cultivation.

Dr. Richard T. Ely, in "Private Colonization of Land," p. 20, says:

"The state, county, and town have an interest at stake where the farms are scattered. All public improvements in such cases involve excessive costs if these improvements are to be satisfactory. This applies to roads, telephones, schools, and so forth. Society loses because the individuals composing it are not so prosperous as they could be. Educational facilities and other advantages of organized society are less than they would be if there were closer settlement."

Upon this subject the Washington court said in State ex rel. State Reclamation Board v. Clausen (Wash.) 188 Pac. 538:

"Our problem, then, is reduced to this: Is the raising of funds by taxation and the expenditure thereof for the purchase of land to the end that it be subdivided, improved, and disposed of as by the terms of this act provided the exercise of the power of taxation and the expenditure of public funds, for a public purpose? It may well be doubted that there has ever come to the American courts any more vexatious question than that of determining whether or not a particular purpose for which public funds were sought to be raised by taxation and expended is a public purpose, when the particular purpose in question lay within that twilight zone wherein the minds may reasonably differ as to such purpose being a public one; the bounds of which zone are ever changing with the passing of time, and within which new problems of public welfare always first appear. That such a question when arising in the courts has proven so vexatious is, we apprehend, because of its inherent nature, in that, in its last analysis it is not one of exclusive legal logic, but is one more or

less of policy and wisdom, properly determinable in the light of public welfare, present and future, in a broad sense, and hence is not a pure judicial law question, except in those cases clearly outside of the twilight zone we have alluded to."

That court also quoted with approval the following from Sun Printing & Pub. Ass'n. v. City of New York, 8 App. Div. 230, 40 N. Y. Supp. 607:

"Where, then, shall we draw the line? It would be very simple to draw it at those purposes for which precedent in the past can be found, and to exclude all others. This test should be easy of application, but would be essentially vicious and erroneous. Growth and extension are as necessary in the domain of municipal action as in the domain of law."

The Washington court also quoted extensively from Perry v. Keene, 56 N. H. 514, the last paragraph of which is as follows:

"After the Legislature and the executive have both decided that the purpose for which a tax is laid is public, nothing short of a moral certainty that a mistake has been made can, in my judgment, warrant the court in overruling that decision, especially when nothing better can be set up in its place than the naked opinion of the court as to the character of the use proposed."

The Washington court also quoted the following pertinent observations from Laughlin v. City of Portland, 111 Me. 486, 90 Atl. 318, 51 L. R. A. (N. S.) 1143, Ann. Cas. 1916C, 734;

"The courts have never attempted to lay down with minute detail an inexorable rule distinguishing public from private purposes, because it would be impossible to do so. Times change. The wants and necessities of the people change. The opportunity to satisfy those wants and necessities by individual effort may vary. What was clearly a public use a century ago may, because of changed conditions, have ceased to be such to-day. Thus the mill act which came into being in the early days of our parent commonwealth of Massachusetts, and was adopted by our own state, was upheld as constitutional because of the necessities of those primitive times. The courts in later days have strongly intimated that were it an original question it might be difficult to sustain it in view of the present industrial conditions. Murdock v. Stickney, 8 Cush. (Mass.) 113; Salisbury v. Forsaith, 57 N. H. 124; Jordan v. Woodward, 40 Me. 317. On the other hand,

36—Vol. 43, S. D.

what could not be deemed a public use a century ago may, because of changed economic and industrial conditions, be such today. Laws which were entirely adequate to secure public welfare then may be inadequate to accomplish the same result now."

The Washington court then said:

"Is there not abundant room for arguing that the development of our unoccupied lands suitable for agriculture, by a land policy which would encourage the settlement thereon of home-owning farmers, will materially contribute to the welfare of our people as a whole? Can it not be argued with a fair show of reason that, not only will such a policy ultimately lead to the enhancement of the material wealth of the state, but that it will also make for better citizenship, better notions of necessity for law and order, and a sounder and saner patriotism?"

We unhesitatingly coincide with the views of the legislature and executive departments of this state that the purposes of chapter 315, Laws 1919, are public purposes.

[6, 7] It is urged that there is no constitutional authority for the state to engage in the business specified in the act. There need be no express constitutional authority therefor. The legislation would be lawful if not prohibited by the Constitution. Platt v. Lecoq (C. C.) 150 Fed. 391; Ohlwine v. Bushnell, 32 S. D. 426, 143 N. W. 362. But we do find express authority in Const. art. 13, § 1, as amended in 1918, which provides:

"For the purpose of developing the resources and improving the economic facilities of South Dakota, the state may engage in works of internal improvement, may own and conduct proper business enterprises."

Whether or not the work contemplated by the act is strictly a work of internal improvement we do not need to determine, because it clearly is a business enterprise which will tend to the development of the resources of the state. That does not admit of argument.

[8] It is contnded that Const. Art. 6, § 18, is violated in that war service persons are given special privileges and immunities by the act. If the act were limited to war service persons it would not violate that section of the Constitution. State ex rel. Morris v. Handlin, 38 S. D. 550, 162 N. W. 379. Still less does it violate that section when it gives "other persons" the same

rights when there are no "soldier applicants."   The same reasons also refute appellant's claim that the equal protection of the law clause in Amendment 14 of the federal Constitution will be violated by this act.

[9]   It is urged that the provisions of the act which authorize the creation of debt and the levy of taxes to meet such debt amount to a deprivation of property without due process of law within the meaning of Const. art. 6, § 2.   12 Corp. Jur. 1255, says:

"It is well settled that the taking of property under the power of taxation, properly exercised, does not constitute a taking without due process of law."

[10]   It is next urged that Const. art. 6, § 13, will be violated in that plaintiff's property will be taken without just compensation by the levying of taxes in support of that act.   This section relates to the exercise of the power of eminent domain, not to the power of taxation.

[11]   It is insisted that the operation of the act will result in unequal and nonuniform taxation in violation of Const. art. 6, § 17.   It is sufficient to state that the last clause of said section, "and all taxation shall be equal and uniform," has been obliterated from the Constitution by the adoption of amended article 11, § 2, in November, 1918.

[12]   It is next urged that the proposed indebtedness authorized by the act will exceed the limit of $100,000 prescribed by Const. art. 13, § 2.   By the specific terms of Const. art 13, § 1, the above $100,000 debt limit does not apply to indebtedness incurred under the provisions of said section 1.   The facts admitted in this proceeding show that the indebtedness incurred under this section (other than for rural credits as to which there is no limit) and to be incurred by the proposed bond issue of $250,000 will be well within the limit of one-half of 1 per cent. of the assessed valuation of taxable property in this state.

[13]   Finally it is urged that Const. Art. 6, § 14, is violated in that a distinction is made in the act between resident aliens and citizens in reference to the possession, enjoyment, or descent of property.   The act is primarily for the benefit of honorably discharged soldiers, sailors, marines, and other persons who have served wtih the armed forces of the United States in the late war

or other wars. Secondarily the act is for the benefit of "other persons." So far no distinction is made between resident aliens and citizens. Former American citizens who served in the Allied armies are included in the priority class if they have been repatriated, but if they have not been repatriated, they may still come within the operation of the act as "other persons" after the list of "soldier applicants" has been exhausted. The objection does not go to the constitutionality of the act, but to the constitutionality of the restriction against returned war service persons who served in the Allied armies, and who have not been repatriated. Such restriction being separable from the other provisions of the act, there will be no necessity of determining that question until one of such persons raises it. Pugh v. Pugh, 25 S. D. 7, 124 N. W. 959, 32 L. R. A. (N. S.) 954; State v. Kirby, 34 S. D. 281, 148 N. W. 533.

We find no provision of the Constitution that is or will be violated by chapter 315, Laws 1919, unless it be the one last mentioned.

The application for the writ of prohibition is therefore dismissed upon its merits.