**HOMESTAKE MINING COMPANY, a corporation, Plaintiff and Appellee,**

v.

**R. Van JOHNSON, Secretary of Revenue, State of South Dakota and the State of South Dakota, Defendants and Appellants.**

**Nos. 14734, 14755.**

Supreme Court of South Dakota.

Argued May 22, 1985.

Decided Sept. 4, 1985.

A.P. Fuller of Amundson & Fuller, Lead, for plaintiff and appellee; George A. Bangs of Bangs, McCullen, Butler, Foye & Simmons, Rapid City, on brief.

John Dewell, Asst. Atty. Gen., Pierre, for defendants and appellants; Mark V. Meierhenry, Atty. Gen., Pierre, on brief.

HENDERSON, Justice.

### ACTION

This appeal questions the constitutionality of the mineral severance tax imposed by SDCL ch. 10–39. The trial court held SDCL 10–39–53 to be an invalid discrimination violating South Dakota Constitution Article VI, §§ 17 and 18, and the Fourteenth Amendment to the United States Constitution and not to be in violation of any other Constitutional provision. The trial court then extended the exemption in SDCL 10–39–53 to Homestake Mining Company. From all determinations adverse to each, both parties now appeal. We affirm in part and reverse in part.

### FACTS

Homestake Mining Company is a California corporation which operates the Homestake gold mine located in Lead, South Dakota. This mine has operated in Lead since 1876. It is the largest producer of gold in North America and the only mining operation of great consequence in the state.

Mining operations have been the object of some form of taxation since 1935. The rate of taxation has varied over the years until 1970 when the tax was repealed. A net profits tax was enacted in 1975. In 1980, this tax was changed from a 4%

variable tax to a 5% tax on the first $10,-000,000 net profits to 15% on net profits over $100,000,000. In 1981, the legislature repealed the net tax and enacted the statutes here in question. These statutes "imposed a severance tax of six percent of the gross yield from the sale of precious metals severed in this state." SDCL 10–39–43. Gross yield is defined as the "total receipts from the sale of precious metals severed in this state." SDCL 10–39–44. An exemption was provided in SDCL 10–39–53, which exempted the application of the provisions of SDCL ch. 10–39 "to any person severing less than one thousand ounces of precious metals in any one calendar year." There is no dispute that Homestake is the only person or mining operation exceeding this 1,000 ounce exemption. In fact, all other persons and mining operations combined, fail to come close to exceeding this limit.

SDCL 10–39–55 also amended the time frame for the reporting period between the 1980 net tax and the 1981 gross tax. It required the filing of a statement on July 31, 1981, showing the gross yield for the period of January 1, 1981, through June 30, 1981. It also required payment of the new gross tax but allowed as a setoff previously paid estimated taxes under the 1980 statute. These statutes did not contain an emergency clause or declaration and were not passed by a two-thirds majority of both legislative houses.

On July 31, 1981, Homestake filed suit and, by an amended complaint, alleged four causes of action. The first cause of action alleged: The statutes violated South Dakota Constitution Article XI, § 13, by "increasing the rate of taxation on the Mine's income or sales without a two-thirds vote of all the members of each branch of the Legislature ...." The second cause of action alleged: The statutes violated South Dakota Constitution Article III, § 22, because they took "effect on January 1, 1981 without a declaration of emergency and without a two-thirds vote of all the members of each branch of the Legislature." The third cause of action alleged: The statutes violated the Fourteenth Amendment to the United States Constitution and South

Dakota Constitution Article VI, §§ 17 and 18, by "imposing on Plaintiff alone unfair, unjust, arbitrary, unequal, discriminatory and confiscatory taxes ...." Homestake's fourth and final cause of action alleged: The statutes burdened interstate commerce in violation of Article I, § 8, of the United States Constitution by imposing

> an unapportioned tax on gross receipts from interstate sales of minerals mined in the State that is disproportional and not fairly related to: Plaintiff's activities in the State, the services provided to Plaintiff by the State and the value of the minerals mined ....

After entertaining a motion for summary judgment, the trial court granted the State summary judgment on the first and second causes of action. After a trial on the remaining allegations, the trial court determined the statutes to be in general compliance with the requirements of the State and Federal Constitutions, but held the 1,000 ounce tax exemption provision, SDCL 10–39–53, to be an invalid discrimination by not providing "the same privileges to Homestake as it does to other precious metal producers" and thus providing for "unequal taxation." Instead of severing the 1,000 ounce exemption provision, or declaring the entire chapter invalid, the trial court extended the 1,000 ounce tax exemption to Homestake. In so doing, the trial court noted this approach may appear novel, but also noted the same principle had been applied in *Quong Ham Wah Co. v. Industrial Accident Comm'n*, 184 Cal. 26, 192 P. 1021, 12 A.L.R. 1190 (1920). The trial court further ordered "the State to reimburse Homestake for the gross tax paid on the first one thousand ounces of precious metal upon which it paid the gross tax each year since the [statutes] went into effect." In the Judgment, this amount was listed as $69,433.96 in principal and $16,-792.68 in prejudgment interest.

### DECISION

### I.

DOES THE 1,000 OUNCE EXEMPTION CONTAINED IN SDCL 10–39–53 VIO-

LATE THE EQUAL PROTECTION CLAUSE AND THE UNIFORMITY, EQUALITY, AND PRIVILEGES AND IMMUNITIES CLAUSES OF THE FEDERAL AND STATE CONSTITUTIONS? THE TRIAL COURT HELD THAT IT DID, BUT WE HOLD THAT IT DOES NOT.

The United States Constitution Article XIV, § 1, provides in relevant part:

No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States, nor shall any state deprive any person of life, liberty or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws.[1]

South Dakota Constitution Article VI, § 18, also provides: "No law shall be passed granting to any citizen, class of citizens or corporation, privileges or immunities which upon the same terms shall not equally belong to all citizens or corporations." South Dakota Constitution Article VI, § 17, further states: "No tax or duty shall be imposed without the consent of the people or their representatives in the Legislature, and all taxation shall be equal and uniform."

We initially note that although this Court has stated that the latter portion of South Dakota Constitution Article VI, § 17, has been obliterated from the Constitution by the amendment of South·Dakota Constitution Article XI, § 2, see Wheelon v. South Dakota Land Settlement Bd., 43 S.D. 551, 563, 181 N.W. 359, 363, 14 A.L.R. 1145, 1151 (1921), Peterson Oil Co. v. Frary, 46 S.D. 258, 266, 192 N.W. 366, 369 (1923), and Commercial State Bank v. Wilson, 53 S.D. 82, 85, 220 N.W. 152, 154 (1928), this Court has later held that "so far as concerns taxes other than property taxes, sec-

tion 17, art. 6, was in no manner affected by the 1918 amendment of section 2, art. 11. It is just as valid and just as much a part of the Constitution as ever it was." State ex rel. Botkin v. Welsh, 61 S.D. 593, 640, 251 N.W. 189, 209 (1933).

■ We also initially note that when considering a statute's constitutionality, it is presumed valid, Direct Auto Buying Service, Inc. v. Welch, 308 N.W.2d 570, 572 (S.D.1981), and should be upheld unless clearly and unmistakably unconstitutional. In re T.L.J., 303 N.W.2d 800, 808 (S.D. 1981).

On this issue, the State contends the legislature has wide discretion in enacting tax statutes, Allied Stores of Ohio v. Bowers, 358 U.S. 522, 526, 79 S.Ct. 437, 440, 3 L.Ed.2d 480, 484 (1959), and may classify and subclassify the objects of a tax if the classification is not arbitrary and unreasonable, State v. Black Hills Transp. Co., 71 S.D. 28, 32, 20 N.W.2d 683, 685 (1945), and all persons within the same class are taxed alike. Fox v. Standard Oil Co., 294 U.S. 87, 101, 55 S.Ct. 333, 339, 79 L.Ed. 780, 790 (1935). The State further contends, in substance, that because large concerns have different economic power than small concerns, the former may be taxed at a higher rate than the latter, as long as all taxpayers of the same size are taxed alike. Fox, 294 U.S. at 100–01, 55 S.Ct. at 338–39, 79 L.Ed. at 789–90; Stewart Dry Goods Co. v. Lewis, 294 U.S. 550, 569, 55 S.Ct. 525, 533, 79 L.Ed. 1055, 1064 (1935) (Cardozo, J., dissenting). The State thus asserts that since the statutes set the classes at those severing more or less than 1,000 ounces in a calendar year, and taxes all persons in those separate classes the same, the statutes are not an invalid discrimination. The State maintains the classification or sub-

---

1. "While a corporation is not a 'citizen' within the meaning of the privileges and immunities clause, a corporation is a 'person' within the meaning of the equal protection and due process of law clauses of the Fourteenth Amendment...." Fulton Market Cold Storage Co. v. Cullerton, 582 F.2d 1071, 1079 (7th Cir.1978) (citations omitted), cert. denied, 439 U.S. 1121, 99 S.Ct. 1033, 59 L.Ed.2d 82 (1979). As herein-before stated, Homestake's third cause of action, inter alia, alleged that SDCL ch. 10–39 violated the Fourteenth Amendment. Since "a corporation is not a 'citizen' within the meaning of the privileges and immunities clause," id., we address Homestake's contentions only in relation to the protection afforded under the Fourteenth Amendment's equal protection clause and the relevant provisions of our state constitution.

classification is reasonable and is based on the frequency and character of the extraction which are permissible considerations for the legislature. *Black Hills Transp.,* 71 S.D. at 35, 20 N.W.2d at 686; *Continental Baking Co. v. Woodring,* 286 U.S. 352, 373, 52 S.Ct. 595, 602, 76 L.Ed. 1155, 1167, 81 A.L.R. 1402, 1415 (1932).

Homestake contends the trial court's ruling on equal protection was correct and in support of its proposition, Homestake cites *Stewart Dry Goods Co. v. Lewis,* 294 U.S. 550, 55 S.Ct. 525, 79 L.Ed. 1054 and *Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue,* 460 U.S. 575, 103 S.Ct. 1365, 75 L.Ed.2d 295 (1983). Homestake asserts that in *Stewart,* the Supreme Court determined a variance in the rate of tax for doing the same identical act, i.e., selling merchandise, was a denial of equal protection. *Stewart* involved a Kentucky license tax on retail merchants which was computed on the amount of gross sales. The higher the gross sales, the higher the percentage of the tax computed thereon. When gross sales reached $400,000, the license tax became effective and for each $100,000 increment above the starting amount, the tax increased. A closer reading of the case, however, reveals the Supreme Court determined this to be a denial of equal protection because the graduated tax rate did not bear any relation to net profits which was Kentucky's rationale for taxing merchants at different rates. Kentucky's theory being—the higher the gross sales, the higher the net profits.

■ Here, the South Dakota Legislature has classified mining operations and subjected them to a tax. In so doing, it has further subclassified between those severing more and those severing less than 1,000 ounces of precious metals. Such subclassification is permissible. *Black Hills Transp.,* 71 S.D. at 35, 20 N.W.2d at 685. The apparent rationale for the subclassification and the exemption of the smaller operators is that those severing more than

1,000 ounces in a calendar year are depleting the state's natural resources, wealth, and a future source of taxation revenue at a much greater rate and therefore must compensate the state for the metals extracted from its earth. In sum, the frequency and character of the activity engaged in are permissible considerations for the legislature. We hold the classification here in question not to be arbitrary or unreasonable and to bear a rational relationship to the purpose of the statute. The trial court's determination that the 1,000 ounce exemption of SDCL 10–39–53 was an unconstitutional discrimination is therefore reversed.[2]

Homestake, as stated above, also cites *Minneapolis Star,* 460 U.S. 575, 103 S.Ct. 1365, 75 L.Ed.2d 295 for upholding the trial court's determination that the 1,000 ounce exemption provision is an invalid discrimination. Although the United States Supreme Court stated that the statute there in question targeted a small group of newspapers, and that only a handful of publishers would pay any tax because of that statute's $100,000 exemption, this aspect of the statute did not violate equal protection. Instead, this was a factor for holding the statute to be in violation of the First Amendment to the United States Constitution. The Court specifically noted its First Amendment ruling rendered it unnecessary to address the equal protection arguments. Thus, *Minneapolis Star,* being strictly a First Amendment case, is inapplicable to the case at bar.

Having determined the 1,000 ounce exemption as not constituting an invalid discrimination and having reversed the trial court's decision in this regard, we deem it unnecessary to address the validity of the 1,000 ounce exemption extended to Homestake. Having reversed the discrimination ruling, the trial court's exemption extension to Homestake falls perforce.

---

**2.** The 1,000 ounce exemption was changed to a 20 ounce exemption by 1984 S.D.Sess.Laws ch. 78, § 8, but is not material to this appeal.

## II.

DID THE ENACTMENT OF SDCL CH. 10–39 VIOLATE SOUTH DAKOTA CONSTITUTION ARTICLE XI, § 13, BY IMPOSING AN INCREASE IN THE RATE OF SALES TAX WITHOUT A TWO-THIRDS VOTE OF THE LEGIS- LATURE? WE HOLD THAT IT DID NOT.

South Dakota Constitution Article XI, § 13, provides:

The rate of taxation imposed by the state of South Dakota on personal or corporate income or on sales or services, or the allowable levies or the percentage basis for determining valuation as fixed by law for purposes of taxation on real or personal property, shall not be in- creased unless by consent of the people by exercise of their right of initiative or by . two-thirds vote of all the members elect of each branch of the Legislature.

This constitutional provision was adopted by a vote of the people on November 7, 1978, and it constitutes a significant re- striction on the legislature's ability to in- crease the rate of certain taxes.

Homestake contends this provision has been violated by the enactment of the stat- utes here in question. Homestake asserts a violation has occurred because the stat- utes are really a sales tax which raises the rate of taxation previously applicable to its sales. To support the first part of this contention, i.e., that the statutes are really a sales tax and not a severance tax, Home- stake directs this Court's attention to two aspects of the statutes' language. First, Homestake points to the fact that it is the sale of precious metals which triggers the imposition of the tax. SDCL 10–39–43 and SDCL 10–39–44. Second, Homestake points to the fact that some of the lan- guage contained in the statutes is the same as language used in the Retail Sales and Service Tax found in SDCL ch. 10–45. Homestake thus argues that the nature of the tax is really a sales tax and not a severance tax even if it may be labeled as the latter.

■ The trial court concluded the stat- utes constituted a tax on the privilege of severing precious metals within South Da- kota and was not a tax upon sales or in- come. It held the sale of precious metals determined the metals' value and thereby provided a measure for the tax and a time for collection. We agree with these conclu- sions and thereby affirm the trial court's ruling.

■ The Act containing the statutes here in question, Chapter 95 of the 1981 South Dakota Session Laws, is entitled: "An Act to enact a mineral severance tax on precious metals." In SDCL 10–39–43, it states: "For the privilege of severing pre- cious metals in this state, there is imposed a severance tax . . . ." Although a legisla- tive tax label does not, ipso facto, deter- mine the nature of a tax, this language evidences the legislative intent to *tax min- eral severance* and *not mineral sales.* Merely because the measure of the tax is gross receipts, does not mean the nature of the tax is a sales tax. In *State ex rel. Botkin v. Welsh,* 251 N.W. 189, this Court upheld a tax as an excise or privilege tax even though the measure of the tax was gross receipts. In the case at bar, the trial court determined the tax in question to be a severance tax which was measured by gross receipts. We affirm that reasoned determination.

We find unpersuasive Homestake's as- sertion that it is a sales tax because a sale triggers the imposition of the tax. The sale cannot occur until there has been a severance from the earth in the first in- stance. Thereafter, a sale merely deter- mines the metal's value and thus provides a measure for the tax and a time for collec- tion. We also find unpersuasive Home- stake's analogy to the Retail Sales and Service Tax. Retail sales are usually of items bought and sold. Homestake is not in the ordinary business of buying gold and then selling it. Homestake's interpretation would totally read out the severance. This we realistically cannot do.

Not being a tax on sales, income, etc., the prohibitions of South Dakota Constitu-

tion Article XI, § 13, are inapplicable. The operating incidence of the tax is the severance of precious metals in South Dakota. The State of South Dakota is not taxing the sales, profit or income which Homestake makes from selling its gold. In contradistinction, the state is taxing the extraction of natural resources. Our State Legislature, the organ of the people, is concerned with the depletion of natural resources; also, it is apparently concerned with the loss of a future source of revenue and wealth. We conclude the State Legislature had the constitutional power to create and denominate a severance tax on precious metals and it was not, in disguise, a sales tax. The trial court's ruling in this regard is therefore affirmed.

### III.

DOES SDCL CH. 10–39 VIOLATE SOUTH DAKOTA CONSTITUTION ARTICLE III, § 22, BECAUSE IT TOOK EFFECT BEFORE JULY 1ST WITHOUT AN EMERGENCY CLAUSE AND A TWO-THIRDS VOTE OF THE LEGISLATURE? WE HOLD THAT IT DID NOT.

South Dakota Constitution Article III, § 22, provides:

No act shall take effect until ninety days after the adjournment of the session at which it passed, unless in case of emergency, (to be expressed in the preamble or body of the act) the Legislature shall by a vote of two-thirds of all the members elected of each house, otherwise direct.

■ As recited in FACTS, *supra,* the severance tax required mining operations to file a statement on July 31, 1981, "showing the gross yield from the sale of precious metals severed in this state during the period from January 1, 1981, through June 30, 1981, and pay the tax due thereon." SDCL 10–39–55. The tax due thereon was calculated under the 6% gross yield standard of SDCL 10–39–43,[3] except a set-

off was allowed for the estimated quarterly taxes paid under the 1980 net profits severance tax for the first 1981 quarter. Thus, only the taxes owed for the second 1981 quarter, to wit, April 1st through June 30th, were determined under the new gross yield standard. SDCL ch. 10–39 became the law on July 1, 1981. It did not contain an emergency clause or declaration and was not passed by two-thirds vote of each house.

Homestake contends this violated South Dakota Constitution Article III, § 22, because the statutes took effect before 90 days after adjournment. Homestake asserts the statutes took effect prior to this time because it was required to calculate its tax liability for the first six months of 1981 under the provisions of the new statutes which were passed and signed on March 7, 1981. The trial court, however, determined the statutes to have taken effect as of July 1, 1981, and therefore did not violate South Dakota Constitution Article III, § 22. The trial court further determined (1) the statutes were retroactive and so intended by the legislature and (2) the nature of the statutes and their retroactive effect was not so harsh or oppressive as to transgress constitutional limitations for a valid tax. With these determinations, we agree.

■ Under SDCL 2–14–16, legislative acts, subject to certain limitations not applicable here, *take effect* on the first day of July after its passage. Merely because the statute has some retroactive application, however, does not mean the statute "takes effect before that date." Retroactive tax statutes are not per se unconstitutional. *Welch v. Henry,* 305 U.S. 134, 146, 59 S.Ct. 121, 125, 83 L.Ed. 87, 93 (1938). However, retroactive application will only be applied when a clear intention of such operation is plainly indicated. *Johnson v. Kusel,* 298 N.W.2d 91, 92 (S.D.1980). If, in light of the nature of the tax and the circumstances

---

**3.** This statute was amended by 1984 S.D.Sess. Laws ch. 78, § 1, changing the tax to a 2% of gross yield standard. Per the enactment of

SDCL 10–39–45.1 in 1984, an additional 8% net profits tax was imposed. These statutes are not under consideration in this appeal.

in which it is applied, its application is not harsh or oppressive, retroactive application will not be unconstitutional. *Burke Mountain Academy, Inc. v. United States,* 715 F.2d 779, 782 (2nd Cir.1983).

In the present case, SDCL ch. 10–39 clearly evidences the legislative intent of retroactive application and in view of its nature and its application, it is not unconstitutionally harsh or oppressive. Its retroactive application was confined to a short and limited period, it did not extend beyond the calendar year, and it only included transactions consummated while it was in the process of enactment. *See United States v. Darusmont,* 449 U.S. 292, 296–99, 101 S.Ct. 549, 551–53, 66 L.Ed.2d 513, 517–19 (1981). The statutes' retroactive application is not unconstitutional and Homestake's contentions that SDCL ch. 10–39 took effect before 90 days after the adjournment of the legislature, in violation of South Dakota Constitution Article III, § 22, are without merit. In sum, although the statutes had retroactive application, they did not take effect and their provisions were not enforceable or applicable until July 1. The trial court's determination on this matter is affirmed.

## IV.

DOES SDCL CH. 10–39 DISCRIMINATE AGAINST AND BURDEN INTERSTATE COMMERCE IN VIOLATION OF ARTICLE I, § 8, CLAUSE 3, OF THE UNITED STATES CONSTITUTION? WE HOLD THAT IT DOES NOT.

United States Constitution Article I, § 8, Clause 3, provides that Congress shall have the power to regulate commerce among the states. Homestake contends SDCL ch. 10–39 violates this provision by "imposing an unapportioned gross receipts tax which is disproportionate and not fairly related to Homestake's activities in the state or services provided by the state ...." In support of its contention, Homestake cites cases wherein the Supreme Court rejected gross receipts taxes on interstate *"sales"* when imposed by the state

from which the goods were sent. *See Evco v. Jones,* 409 U.S. 91, 93 S.Ct. 349, 34 L.Ed.2d 325 (1972); and *Gwin, White & Prince, Inc. v. Henneford,* 305 U.S. 434, 59 S.Ct. 325, 83 L.Ed. 273 (1939). Homestake then reverts to arguing the nature of the tax, i.e., the tax here is a sales tax and not a severance tax, so as to support its Commerce Clause arguments. For the reason that we have held the statutes to be a severance tax and not a sales tax, we reject Homestake's contentions. We uphold the trial court's determination that SDCL ch. 10–39 does not violate the Commerce Clause. We delineate our reasoning below.

In *Commonwealth Edison Co. v. Montana,* 453 U.S. 609, 101 S.Ct. 2946, 69 L.Ed.2d 884 (1981), *reh'g denied,* 453 U.S. 927, 102 S.Ct. 889, 69 L.Ed.2d 1023 (1981), the Supreme Court upheld a severance tax imposed on every ton of coal mined in that state. The Montana tax rate varied according to value, extraction method, and energy content and could equal a maximum of 30% of the contract sales price. The Supreme Court upheld the Montana severance tax from, inter alia, Commerce Clause challenge and in so doing evaluated the severance tax under the test set forth in *Complete Auto Transit, Inc. v. Brady,* 430 U.S. 274, 279, 97 S.Ct. 1076, 1079, 51 L.Ed.2d 326, 331 (1977), *reh'g denied,* 430 U.S. 976, 97 S.Ct. 1669, 52 L.Ed.2d 371 (1977). *Complete Auto Transit* held that a state tax does not violate the Commerce Clause when it "is applied to an activity with a substantial nexus with the taxing State, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the State." *Id.* This is a four-prong test. After evaluating the severance tax under the four-prong test of *Complete Auto Transit,* we uphold the trial court's determination that SDCL ch. 10–39 does not violate the Commerce Clause.

There can be no doubt that the severance of precious metals within South Dakota has a substantial nexus with this state. In fact, this activity can have no nexus with

any other state. Therefore, the first prong of the test is satisfied.

SDCL ch. 10–39 likewise satisfies the second portion of the test, the apportionment provision, because the severance occurs completely in South Dakota and no other state. Therefore, no other state can tax the severance and there is no apportionment problem.

The third prong of the *Complete Auto Transit* test pertains to discrimination against interstate commerce. Here, Homestake argues that because almost all of the gold it mines is shipped out of state, the tax discriminates against interstate commerce. The Supreme Court in *Commonwealth*, 453 U.S. 609, 101 S.Ct. 2946, 69 L.Ed.2d 884 rejected an identical argument. The severance tax is applied at the same evenhanded rate despite the precious metals' final destination. Gold shipped out of state is taxed at the same rate as gold retained in the state; therefore, discrimination does not surface and we reject Homestake's argument in this regard.

The fourth and final prong of the test, the "fairly related to the services provided by the State" provision, is also satisfied. *Complete Auto Transit*, 430 U.S. at 279, 97 S.Ct. at 1079. The operating incidence of these statutes, as we held above, is the severance of precious metals within South Dakota and its measure is 6% of the value as determined by the gross receipts. This severance tax "is in 'proper proportion' to [Homestake's] activities within the State and, therefore, to their 'consequent enjoyment of the opportunities and protections which the State has afforded' in connection with those activities." *Commonwealth Edison Co.*, 453 U.S. at 626, 101 S.Ct. at 2958, 69 L.Ed.2d at 900 (citation omitted). Attached hereto and by this reference made a part hereof, is Defendants' (appellants') Exhibit C, reflecting that between 1967 and 1982 Homestake sold $854,707,-000 of gold and silver extracted from the mountains of South Dakota. During this period of time, it paid $17,880,827 in ore taxes. This exhibit is a meaningful history of the enjoyment that Homestake has had in the mining industry in South Dakota. Homestake argues that the tax is excessive because it does not consider costs of extraction. We answer this argument by quoting *Commonwealth Edison Co.*, 453 U.S. at 627, 101 S.Ct. at 2958–59, 69 L.Ed.2d at 901: "The simple fact is that the appropriate level or rate of taxation is essentially a matter for legislative, and not judicial, resolution." Homestake, while working in South Dakota, and establishing the largest gold production on the North American Continent, enjoys the conventional services, advantages, safeguards, and conveniences which government avails. We therefore affirm the trial court's determination concerning the Commerce Clause challenge.

Affirmed in part and reversed in part.

All the Justices concur.

WUEST, Circuit Judge, Acting as Supreme Court Justice, participating.