STATE ex rel. MORRIS, Adjutant General, Plaintiff, v. HANDLIN, State Auditor, Defendant.

(162 N. W. 379.)

(File No. 4178.   Opinion filed April 12, 1917.)

1.  States—Appropriation for State Militiamen—Legislative Power to Grant—Constitutionality—Statute.

    Laws 1917, Chap. 51, provides that every enlisted man of the Fourth South Dakota Infantry called into the federal service for duty on Mexican border in 1916-1917, shall be paid the sum of $75.00, and appropriating $75,000.00, etc., from general state funds. Const., Art. 11, Sec. 9, provides that no indebtedness shall be incurred by the state and no warrant shall be drawn upon the state treasurer, except in pursuance of an appropriation for the specific purpose first made. Art. 12, Sec. 3, provides that the Legislature shall never grant any extra compensation to any public officer, employe, or agent, after the service shall have been rendered, or the contract entered into, nor authorize the payment of any claim created against the state, under any agreement or contract made without express authority of law, except that the Legislature may make appropriations for expenditures incurred in suppressing insurrection or repelling invasion. Art. 13, Sec. 1, provides that neither the state, nor any subdivision shall loan or give its credit or make donations to or in aid of any individual, etc., nor pay or become responsible for the debt or liability of any individuals, etc., except that the state may assume or pay such debt or liability incurred in time of war for the defense of the state. Held, that said three sections of the Constitution must be construed and read in the light of each other; that said Chapter 51 is not unconstitutional, even though at the time the military services were performed and the obligation to pay therefor was incurred no appropriation had been made; that the act expressly authorizes said appropriation.

2.  Militia—State Infantry—Legislative Appropriation for—Federal Drafting of Militia, Effect as to the "National Guard"—"Insurrection," "Invasion," "State of War," Whether Existing?—State and Federal Statutes, Constitutions.

Const. U. S. Art. 1, Sec. 8, provides that congress shall have power to provide for organizing militia, and for governing such part of same as may be employed in the federal service, etc. State Const., Art. 15, Secs. 2 and 3, provides that the Legislature shall provide by law for enrollment and establishment of volunteer organizations of state militia for protection of the state.    **Held,** that Laws 1917, Chap. 51, providing that every enlisted man of the Fourth South Dakota Infantry shall, at time of his return from federal service, be paid the sum of $75.00, and appropriating $75,000.00 therefore is not invalid on the ground that said regiment, when drafted into the federal service under provisions of act of Congress of June 3, 1916, known as the "National Defense Act," ceased to be part of the National Guard of this state, and that thereafter said regiment was performing services for the federal government and not for the state, or on the ground that there had been no insurrection, invasion, or state of war existing within the territorial limits of this state; since, notwithstanding the said federal act provides that in case of threatened invasion of the United States the President may draft into service the State National Guard, and that when so drafted it is discharged from the militia during service under the draft, yet said regiment was so drafted as members of the State National Guard, and for the purpose of repelling invasion of the United States; that any assault upon the government of the United States by insurrection or invasion is also an assault against each and every state government in the Union; and under Const., Art. 4, Sec. 4, the Governor is made commander in chief of the militia forces of the state, except when called into federal service, and thereunder, as well as under said statute, it was contemplated that to perform his service and duty for which he enlisted as militiaman he might be called into active service by either the state or nation; that at all times since enlistment, including the time they were on the Mexican Border under said draft, said regiment has been, in a sense, the National Guard of this state; and said services were rendered in part for the benefit of this state; that in resisting threatened invasion or insurrection, the interest and duties of state and nation relative to common defense in resisting threatened invasion or insurrection, are inseparably interwoven.

**3.    States—Appropriation for State Militia, Whether a Donation?—Statute, Constitutionality of.**

The appropriation made by Laws 1917, Chap. 51, providing that every enlisted man of the Fourth South Dakota Infantry called into federal service for duty on Mexican Border in 1916-1917, is not a donation, within the meaning of Const., Art. 13, Sec. 1, prohibiting donations to individuals, etc., and is not

violative of said constitutional provision; since, under the pre-
amble to the state Constitution, one of the means for providing
for the "common defense," "promoting the general welfare,"
and "preserving to ourselves and to our posterity the blessings
of liberty," is the organization and maintenance of the militia;
and any appropriation furthering or encouraging said ends is
a public and beneficial purpose, and services of a state militia
are rendered for benefit of the public, and not for the benefit
of any particular individual.

Mandamus by the State of South Dakota, on the relation of
William A. Morris, as Adjutant General, against J. E. Handlin,
as State Auditor, to test the validity of a legislative enactment
appropriating moneys for state militia. Writ granted.

*Gaffy & Stephens, Horner, Martens & Goldsmith; John
Sutherland, Sterling & Clark,* and *Morris & Moriarty,* for Plain-
tiff.

*Clarence C. Caldwell,* Attorney General, for Defendant.

(2) To point two of the opinion, Plaintiff cited: Act Cong.
June 3, 1916, Secs. 57, 111; Const. Art. 13, Sec. 1; Art. 11,
Secs. 8, 9,; Art. 12, Sec. 3; Art. 13, Sec. 1; U. S. Const. Art.
1, Sec. 10; Attorney General Report pp. 123-132; Laws 1903,
Chap. 185, Secs. 27, 28, 32, 44, 46, 59, 62; Laws 1913, Chap.
267; U. S. Comp. St. Secs. 1625-1661 (1909 Supplement, pp.
377, 392); Act. Cong. June 30, 1916, Secs. 58, 69, 70; 27 Cyc.
505; Const. Art. 15, Secs. 2, 3, 4; Cutting v. Taylor, 3 S. D.
11; McCoy v. Handlin, 35 S. D. 487; Carter v. Thorson, 5 S.
D. 474; Sweeney v. Commoner, 82 S. W. 639; Worth, Treasr., v.
Craven Co. Comrs, 24 S. C. 778; People v. Bard, 103 N. E. 140;
State v. Love, 34 L. R. A. (N. S.) 607; U. S. v. Barnette, 41
L. ed. 675; U. S. v. Lee, 26 Fed. Cases, 15587, page 909.

McCOY, J  Prior to the 21st day of June, 1916, there had
been organized in this state a militia regiment known and desig-
nated as the Fourth South Dakota Infantry. On the 21st day of
June, 1916, the Governor of this state, acting upon instructions
from the President of the United States calling out the state
militia for the purpose of protecting territory of the United
States from threatened invasion and aggression on the part of
Mexico, promulgated his order requiring the mobilization of the
members of said Fourth South Dakota Infantry. Immediately
thereafter said regiment was mobilized at Redfield, this state,

where it remained until July 30, 1916, at which time it was transported to San Benito, Tex., where it remained in active service until the 3d day of March, 1917, at which time said regiment was mustered out and relieved from service of the United States, and permitted to return to the state of South Dakota.

The 1917 session of the Legislature passed an act (chapter 51, Laws 1917) providing that every enlisted man of the said Fourth South Dakota Infantry shall be paid at the time of his return from federal service the sum of $75; and which act appropriates from the general funds of the state $75,000, or so much thereof as may be necessary to make said payment, for the "purpose of encouraging military training, the payment for services of the members of said regiment for federal services upon the Mexican border, and for continued service in the National Guard Reserve of the United States"; and which act also provided that the state auditor should issue his warrant to the adjutant general for such amount as might be shown by pay rolls duly signed by said enlisted men. Thereafter the adjutant general prepared and presented pay rolls signed by the said members of said regiment entitled to receive said payment under the provisions of said act to the state auditor who, considering that there might be some question as to the constitutionality of said act, refused to issue his warrant to the adjutant general as provided by said act. No question was made as to the correctness of said pay rolls or as to the persons entitled to receive payment under said act. This original proceeding in mandamus was thereupon instituted by the state of South Dakota, upon the relation of the adjutant general, against the state auditor, to test the validity of said legislative enactment.

[1] The sole and only question for determination is the constitutionality of the said appropriation. It is the contention of the auditor that the enactment is void in that it conflicts with each of the following sections of our state Contsitution: Section 9, art. 11; section 3, art. 12; and section 1, art. 13. Section 9, art. 11, provides that:

"No indebtedness shall be incurred or money expended by the state and no warrant shall be drawn upon the state treasurer except in pursuance of an appropriation for the specific purpose first made."

The specific contention is that at the time the services were performed and the obligation to pay therefor was incurred no appropriation for the purpose had been made. If section 9, art. 11, was the only section in the Constitution relating to public indebtedness and the incurring and payment thereof, then there might be some possible merit in the contention. We are of the view, however, that all three of the said sections of the Constitution relate to the subject of the incurring and payment of public indebtedness, and that these sections of the Constitution must be construed and read in the light of each other. Section 3, art. 12, provides that the Legislature shall never grant any extra compensation to any public officer, employee, agent, or contractor after the services shall have been rendered, or the contract entered into, nor authorize the payment of any claims created against the state, under any agreement or contract made without express authority of law; provided, however, that the Legislature may make appropriations for expenditures incurred in suppressing insurrection or repelling invasion. Section 1, art. 13, provides that neither the state, nor any county, township, or municipality shall loan or give its credit or make donations to or in aid of any individual, association, or corporation, nor pay or become responsible for the debt or liability of any individual, association, or corporation; provided, that the state may assume or pay such debt or liability incurred in time of war for the defense of the state. As will be observed, the concluding proviso of section 3, art. 12, as well as the concluding proviso of section 1, art. 13, contemplates and authorizes appropriations after the rendition of the services and after the incurring of the indebtedness. Insurrection, invasion, and time of war are conditions that may come upon us very quickly, and it would be extremely impractical and cumbersome, in many cases, to call together the Legislature in order to first make an appropriation for expenses that might be incurred under such conditions. We are therefore of the opinion that the builders of our Constitution had in view circumstances similar to those that now exist in this case when they created these concluding provisos to these two sections of the Constitution permitting appropriations after the incurring of the indebtedness. It will be observed, also, that section 3, art. 12, provides that payment shall not be made of any claim under

any contract or egreement, unless such contract or agreement was expressly authorized by law. The act in question is itself a law expressly authorizing this appropriation.

[2] It is contended on the part of the state auditor that inasmuch as the Fourth South Dakota Infantry was on the 30th day of July, 1916, drafted into the service of the United States under the provisions of the act of Congress of June 3, 1916, known as the "National Defense Act," that said regiment ceased to be a part of the National Guard of this state, and that thereafter said regiment was performing services for the government of the United States and not for the state of South Dakota. It is also contended that there has been no insurrection, invasion, or state of war existing within the territorial limits of this state, and that this state is not liable for the payment of services rendered in repelling invasion of the state of Texas. These two contentions will be considered together. The National Defense Act of June 3, 1916, provides that in case of threatened invasion of the United States the President may draft into service the state National Guard, and that when so drafted it shall stand discharged from the militia during the period of service under the draft. It is the contention that by virtue of this enactment when the Fourth South Dakota Infantry was drafted into the federal service the state was released from all obligation and liability to pay the members of said regiment during the time they were under the draft on the Mexican border. This may be true as applied to strict contractual liability. Yet there is a higher and more broad and comprehensive view of this subject. By virtue of their voluntary enlistments as members of the state National Guard, and not otherwise, this regiment was drafted by the President and compelled to serve for the purpose of repelling invasion of the United States, which was not merely invasion of the state of Texas, although a part of the threatened invasion happened to occur on the border line between Mexico and the state of Texas. So far as the merits of this controversy are concerned, it is immaterial in what state the threatened invasion was about to happen. Looking at the substance and general spirit of the situation we are of the view that any assault upon the government of the United States by insurrection or invasion is also an assault against each and every state govern-

ment in the Union, and that it is equally the duty of the state to assist in repelling such assaults. Of course there might be an insurrection purely of a local nature and only in hostility to the laws of a state, to suppress which there might not be authority to take the National Guard from one state into another, but that is not this case. Sections 2 and 3, art. 15, State Const., say that the Legislature shall provide by law for the enrollment and establishment of volunteer organizations of state militia for the protection of the state, conforming, as nearly as practical, to the regulations for the government of armies of the United States. Section 8, art. 1, Const. U. S., provides that Congress shall have power to provide for organizing militia, and for governing such part of the same as may be employed in the service of the United States, reserving to the states the appointment of the officers and authority of training the militia according to discipline prescribed by Congress. Section 4, art. 4, of our state Constitution, among other things, provides that the Governor shall be commander-in-chief of the military forces of the state, except when they shall be called into the services of the United States. Under this paramount organic law, as well as under the statute of this state, it was clearly contemplated that to perform his service and duty for which he enlisted a member of the state militia might be called into active service by either the state or nation. It is by virtue of the voluntary enlistments under the laws of this state and the laws of the United States that this regiment, without having anything to say about it, was drafted and compelled to serve in repelling threatened invasion, and notwithstanding it was discharged from militia service during the period of the draft, nevertheless, at the expiration of the draft period, this regiment was not mustered out of service entirely, but only out from under the draft, and then returned to the state, as state militia or national guard, when and where it again became subject to be called into active service either by the Governor of the state or the President of the United States. At all times since enlistment, including the time they were on the Mexican border under the draft, this regiment has been, in a certain sense, National Guard of the state of South Dakota. Both federal and state services were in contemplation and a part of the law under which these enlistments were secured. The services performed

while under the draft were public and rendered, in part, for the benefit of this state as one of the states of the nation. It would seem from a reading of the state and federal Constitutions that the interests and duties, on the part of the state and nation in relation to the common defense in resisting threatened invasion or insurrection, are so inseparably wound and woven together that it would make but little difference, if any, whether the members of the military organization which were to receive the benefit of the appropriation was state or national, although a state might not be warranted in so assisting those who were not residents of or accredited to the state making such appropriation.

[3] It is also contended that the appropriation in question is as a matter of fact a donation and in violation of the Constitution. We are of the opinion that this contention is not well grounded. As will be observed this appropriation itself states that it was made for the purpose of encouraging military training and service by the payment to the members of the South Dakota National Guard for federal services upon the Mexican border, and for continued serivce in the National Guard Reserve of the United States. It is therefore very clear that this appropriation in question was not made as a gift, nor from motives of charity, although the individual members of this regiment were to receive it; but it was made on the ground of and because it was beneficial to the people of this state for purposes of protection to the public. It was made with a view of securing protection to the lives, liberties, and property of the citizens of this state. This is the expressly avowed purpose of our state Constitution authorizing the Legislature to establish and maintain a voluntcer national guard or milita. Self-preservation is the first law of nature, and is an inherent power of government, and one of the foundation reasons, in this country, for the existence of a Constitution. The preamble to our state Constitution reads as follows:

"We, the people of South Dakota, grateful to Almighty God for our civil and religious liberties, in order to form a more perfect and independent government, establish justice, insure tranquility, provide for the common defense, promote the general welfare and preserve to ourselves and to our posterity the blessings of liberty, do ordain and establish this Constitution for the state of South Dakota."

One of the means for providing for the "common defense," promoting the "general welfare," and preserving "to ourselves and to our posterity the blessings of liberty," is the organization and maintenance of the militia. Any appropriations made in furtherance of and for the purpose of encouraging the organization and maintenance of a more effective militia is most certainly a public and beneficial purpose within the purview of the purposes for which our Constitution was created. Services rendered by a state militia, whether on command of the Governor or President, are rendered for the benefit of the public and not for the benefit of any particular individual. We are of the view, therefore, that the provisions of section 1, art. 13, prohibiting donations to individuals, associations, or corporations, was never intended to apply to appropriations made for the purposes of encuraging more efficient military training and enlistments in the militia, or for the payment of services such as have been rendered by the regiment in question. The provisions of this section of our Constitution prohibit the Legislature from donating money for private enterprises, and for prohibited internal improvements, but never were intended to prohibit the Legislature from making appropriations for the purposes of self-preservation, otherwise this provision would be in direct conflict with the very purposes for which our Constitution was created as declared by its preamble. That construction, wherever possible, should be placed upon this Constitution which harmonizes all the various purposes and provisions thereof. These views indicating the line of demarkation between legislative donations for private enterprises and appropriations for public purposes are well sustained by the following authorities: Brodhead v. Milwaukee, 18 Wis. 624, 88 Am. Dec. 711; Speer v. School Directors, 50 Pa. 150; Booth v. Town of Woodbury, 32 Conn. 118; Opinion of Justices, 175 Mass. 599, 57 N. E. 675, 49 L. R. A. 564; Woodall v. Darst, 71 W. Va. 351, 77 S. E. 264, 80 S. E. 367, 44 L. R. A. (N. S.) 83, Ann. Cas. 1914B, 1278, and note 27 Ann. Cas. 951; Cutting v. Taylor, 3 S. D. 11, 51 N. W. 949, 15 L. R. A. 691. This last-cited case related to an appropriation for an award for services rendered by certain fire companies within this state, and in rendering the opinion this court said:

"As a means of securing greater efficiency in this important service of the state, in the preservation of the property of its citizens, the Legislature has advertised by a general law that such fire companies as would comply with certain conditions * * * would be entitled to receive the payment or reward provided in the law. * * * It is not a donation * * * upon consideration of gratitude. * * * It is an appropriation to a proper, governmental public purpose, and is received * * * not as a donation or gift, but as fairly and fully earned and justly paid. The appropriation is not made from motives of charity, but as a matter of business policy."

In the case of Broadhead v. Milwaukee, supra, arising in the state of Wisconsin, in relation to the constitutionality of an appropriation of money by the state Legislature for the payment of bounties to encourage enlistments in the Civil War, the Supreme Court of that state, in holding that the same was a public purpose, used the following very appropriate language:

"I think the consideration of gratitude alone to the soldier for his services, be he volunteer, substitute or drafted man, will sustain a tax for bounty money to be paid to him or his family. Certainly no stronger consideration of gratitude can possibly exist than that which arises from the hardships, privations and dangers which attend the citizen in the military service of his country; and all nations have ever so regarded it. Who will say that the Legislature may not, in consideration of such services, either directly or indirectly, or through the agency of the municipality or district to which he is credited, give to the soldier or his family a suitable bounty after his enlistment, or even after his term of service has expired? I certainly cannot. It is a matter which intimately concerns the public welfare; and that nation will live longest in fact, as well as in history, and be most prosperous, whose people are most sure and prompt in the reasonable and proper acknowledgment of such obligations."

In Booth v. Town of Woodbury, supra, also a case arising at the time of the Civil War in relation to bounties paid to secure enlistments, the Supreme Court of Connecticut held that:

"Although the state as such is under no obligation to aid the general government in raising an army for national defense, yet the general good of the people of the state is involved in the

maintenance of the general government, and the Legislature may properly act for this general good, * * * for the public welfare of the state, * * * that it is one of the inherent powers of the state government."

It is clear that the appropriation in question was made for a public purpose advantageous to the welfare of this state. Hence we are of the view, and therefore hold, that the said appropriation is valid, and not in conflict with any of the provisions of our state Constitution.

The writ prayed for is granted.