(No. 5818. December 3, 1932.)

OREGON SHORT LINE RAILROAD COMPANY, a Corporation, Respondent, v. LAURA B. BERG, as Treasurer and *Ex-officio* Tax Collector of Bannock County, Idaho, BANNOCK COUNTY, a Municipal Corporation of the State of Idaho, and the CITY OF POCATELLO, a Municipal Corporation of the State of Idaho, Appellants.

[16 Pac. (2d) 373.]

500

Isaac McDougall, Merrill & Merrill and Jones, Pomeroy & Jones, for Appellants.

H. B. Thompson, George H. Smith and L. H. Anderson, for Respondent.

GIVENS, J.—Prior to the time chapter 134, Sess. Laws 1929, became effective, the City of Pocatello organized Local Special Improvement District No. 28. Whether under chap. 257, Sess. Laws 1927, or the statutes in effect prior thereto, the record does not disclose, and is perhaps not material, inasmuch as the portions of chap. 257, Sess. Laws 1927, and the statutes in effect prior thereto as bearing on the controversy herein, are substantially the same.

Special local assessment improvement district bonds were issued and sold, and later when insufficient funds were realized from the district to pay the bonds, September 13, 1929, the city made a levy for the benefit of the said district of .063 cents on each one hundred dollars of value of taxable property in the city, under sec. 9, chap. 134, Sess. Laws 1929, which authorizes municipalities to create a guarantee fund for general taxes levied on the entire municipality, with which to pay deficiencies in special local assessment improvement districts.

Respondent paid its tax under protest, and herein seeks to recover it, contending that said sec. 9 is unconstitutional and void, as in violation of sec. 4, art. 8, and sec. 13, art. 1, Constitution of the state of Idaho, and the Fourteenth Amendment to the Constitution of the United States. The bonds considered herein were not general obligations of the city, only of the district, *in rem* (*Blackwell v. Village of Coeur d'Alene,* 13 Ida. 357, at 371, 90 Pac. 353), and had for security only the property within the district, and when the particular assessment levied against any particular individual and separate piece of property was paid, its share or proportion of the bonded indebtedness was liquidated; in other words, such piece of property was discharged from any further liability or obligation upon the bonds. This provision by statutory requirement (C. S., secs. 4026, 4151; sec. 35, chap. 257, Sess. Laws 1927, p. 457) was written into the bond, and of course became the binding contract between the bondholder and the district (*Neighbors of Woodcraft v. City of Rupert,* 51 Ida. 215, 4 Pac. (2d) 360), the city being obli-

gated only to make the necessary collections and payment, and if any piece of property defaulted, the bondholders had the right to foreclose on the same. (*Blackwell v. Village of Coeur d'Alene, supra; Broad v. City of Moscow,* 15 Ida. 606, 99 Pac. 101; *New First Nat. Bank v. City of Weiser,* 30 Ida. 15, 166 Pac. 213; *New First Nat. Bank v. Linderman,* 33 Ida. 704, 198 Pac. 159.)

■■ Due process as to the organization of the local special assessment district and the issuance of bonds as obligations on the property within the district was afforded by the notice to all parties interested, given by the city following its ordinance of intention, and hearing before the council as to the organization of the district, and later assessment of benefits by the city for, and in connection with, the district. (C. S., secs. 4003–4012, 4129–4139; secs. 10–20, chap. 257, Sess. Laws 1927.) As to the taxpayer within the district, the only notice with regard to what liability would attach to his property and the liability fixed by the bonds and the assessment of benefits and charges in connection therewith was of course limited to the particular assessment on his individual separate and particular piece of property. As to any taxpayer of the city without the district, no notice as such was given, and since no burden was placed upon his land by the organization of the assessment district, or anything in connection therewith, or with the issuance of bonds therefor, no notice was necessary. (*Stark v. McLaughlin,* 45 Ida. 112, at 130, 261 Pac. 244.) In other words, under the doctrine of the cited case, if no burden was to be imposed upon what we might term an external taxpayer, that is, one without the district, but within the city, no notice was required. But if any burden had been contemplated, notice and a hearing were required to afford due process. (*Davidson v. Board of Administrators,* 96 U. S. 97, 24 L. ed. 616, 619; *Brown v. City of Denver,* 7 Colo. 305, 3 Pac. 455, 458; *Hibben v. Smith,* 191 U. S. 310, 24 Sup. Ct. 88, 48 L. ed. 195, 200; *Londoner v. City and County of Denver,* 210 U. S. 373, 28 Sup. Ct. 708, 52 L. ed. 1103, 1112; *King*

v. *City of Portland,* 184 U. S. 61, 22 Sup. Ct. 290, 46 L. ed. 431, 436; *Williams v. Eggleston,* 170 U. S. 304, 18 Sup. Ct. 617, 42 L. ed. 1047.)

We are not herein concerned with whether or not in the first instance the legislature might authorize the city to pay for these improvements, partly by special assessments charged against the abutting or contiguous property and partly by general levy (*Parsons v. District of Columbia,* 170 U. S. 45, 18 Sup. Ct. 521, 42 L. ed. 943), but whether, where the indebtedness in the first instance was, specifically by statute, by the terms of the bonds themselves, by decisions of this court, and by notice and hearing and municipal ordinance, made a liability only upon the property within the district and the liability of each individual piece of property limited thereto, may now, as to the residue of such indebtedness unpaid, be made a general obligation on the city, binding all the taxpayers within the municipality where the external taxpayer had no notice, and so far as the terms of the statutes themselves were concerned (*Caldwell v. Village of Mountain Home,* 29 Ida. 13, at 23, 156 Pac. 909), had no right to a hearing as to the organization of the district in the first place, and where the internal taxpayer was given notice and had a hearing only as to a limited liability upon his property and with specific declarations, contractual, statutory and judicial, that such was the limit of his liability.

Such original liability was not within the contemplation of sec. 3, art. 8, of the Constitution. (*McGilvery v. City of Lewiston,* 13 Ida. 338, 90 Pac. 348.)

If now, by sec. 9 of the 1929 act, it is converted into a general obligation, it comes within the purview of said section (*Byrns v. City of Moscow,* 21 Ida. 398, 121 Pac. 1034), and yet no taxpayer has had notice of, or chance to be heard as to, such transmutation.

Furthermore, while a tax is considered not a contract, the bond and the obligation thereof as between the bondholder and the property owner within the improvement district clearly becomes a contract of limited liability.

To now in effect increase the liability upon these bonds to the extent of the special additional tax on internal tax-payers would, to that extent, impair the obligation of their contract by increasing their liability. (Const., art. 1, sec. 16; Const. U. S., art. 1, sec. 10; *Bacon v. Road Improvement District*, 157 Ark. 309, 248 S. W. 267; *Union Gas & Oil Co. v. Diles*, 200 Ky. 188, 254 S. W. 205; *O'Connor v. Hartford Accident & Indemnity Co.*, 97 Conn. 8, 115 Atl. 484, 486, in which the court said: "Any law which changes the intention and legal effect of the original parties, giving to one a greater and to the other a less interest or bene-fit in the contract, impairs its obligation. The extent of the change is immaterial. Any deviation from its terms by hastening or postponing the time of performance which it prescribes, or imposing conditions not included in the con-tract, or dispensing with the performance of those that are included, however small and unimportant they may ap-pear to be in their effect, impairs the obligation of a contract.")

In *In re Fidelity State Bank of Orofino*, 35 Ida. 797, 809, 31 A. L. R. 781, 209 Pac. 449, 451, this court said:

"The statutes of this state . . . . as well as the deci-sions of this court, became a part of the contract of special deposit when the deposit was made.

"In the case of *Von Hoffman v. Quincy*, 4 Wall. (U. S.) 535, 18 L. ed. 403, the court said: 'It is also settled that the laws which subsist at the time and place of the making of a contract, and where it is to be performed, enter into and form a part of it, as if they were expressly referred to or incorporated in its terms. This principle embraces alike those which affect its validity, constructions, discharge, and enforcement.'"

If it be contended that either class of taxpayers, inter-nal or external, has an opportunity to be heard before the city council when the ordinance creating the guarantee fund, after the theretofore organized districts have become a closed chapter except as to payment thereof, consti-tutes due process, we are met with this situation: The internal delinquent taxpayer because of whose delinquency

a deficiency has arisen in the district, in the first instance, had a hearing, i. e., as to the organization of the district which is now not accorded the external taxpayer who is yet called upon to pay for the defaults of the internal taxpayer. Indirectly there is thus saddled on to the external taxpayer an indebtedness concerning the incurring of which he had neither notice nor hearing; and as to the internal taxpayer who has paid his assessment, the imposition of a different and additional obligation than the one concerning which he had a notice and hearing.

In *Booth v. Groves,* 43 Ida. 703, 255 Pac. 638, the court had under consideration the constitutionality of an act requiring all those within the tentative and preliminary confines of a drainage district to pay a flat fee of not in excess of $1 an acre, to defray the preliminary expenses of organization and petition to the district court, looking to the permanent establishment of such district. The court held the imposition of this burden, considered as a special assessment, unconstitutional, because no hearing constituting due process was afforded the land owner. No distinguishing features making the principle of this case inapplicable are suggested. If, at the time the ordinance authorizing the guarantee fund, a taxpayer could question anything which might have been raised at the time the city contemplated the organization of the taxing district, to be effective, it would injuriously affect the bondholder, and counsel for appellants does not contend for any such right. Furthermore, the statutes limit the time within which such protests or objections could be effectively made. (C. S., secs. 4009–4012; C. S., sec. 4137; sec. 11, chap. 257, Sess. Laws 1927, p. 445; *Blackwell v. Village of Coeur d'Alene, supra; Caldwell v. Village of Mountain Home, supra.*)

Counsel for appellants cite two Utah cases and one Washington case as sustaining the constitutionality of this act. In *Wicks v. Salt Lake City,* 60 Utah, 265, 208 Pac. 538, the court did not consider the statute therein involved with regard to the due process clause of the Constitution as to the payment for theretofore organized districts, and

in *Deseret Sav. Bank v. Francis,* 62 Utah, 85, 217 Pac. 1114, the sole question involved was whether or not the act was mandatory or merely directory.

In *Comfort v. City of Tacoma,* 142 Wash. 249, 252 Pac. 929, the sole question involved from the constitutional standpoint was whether or not the guarantee fund increased the debt limit of the municipality beyond the constitutional limitations. It will be noticed that Washington has held it unlawful for a duly organized municipality to attempt to assume as legal and binding obligations, indebtedness incurred for special improvements as local assessments, by an illegally organized predecessor municipality (*State v. Moss,* 44 Wash. 91, 86 Pac. 1129), and this rule has been followed in *State v. City of Blaine,* 44 Wash. 218, 87 Pac. 124; *Pratt v. City of Seattle,* 111 Wash. 104, 189 Pac. 565, 571; *State v. Hastings,* 120 Wash. 283, 207 Pac. 23.

*New York Life Ins. Co. v. Board of Commrs.,* 106 Fed. 123, cited by appellants, considered first the retroactive feature of the act under consideration, which point is not involved herein; and second, the moral obligation of the county to make good a fund which the county in the first instance had established, later found to be unconstitutional, not in substituting the county's obligation for an obligation of a separate or inferior division or branch or arm of the county, wherein the obligation in the first instance was not a general obligation of the county as herein.

Appellants argue that there is a moral obligation resting on the city to make good the defaulted bonds and keep the credit of the city good. There is an equal moral obligation resting on the city as well as a legal and constitutional one, to respect and regard the rights of the taxpayer. The bondholder, when he purchased, knew the nature of the security he was purchasing and its limited value, and it was through no fault of the now additionally burdened payer of the bond obligation that such original security has proved faulty. As pointed out above, the external taxpayer has had no process at all, and the internal, of a limited kind. As to the morals, they are

certainly no more than equal as between the bondholder and the taxpayer, and the constitutional safeguards which are entitled to some consideration, as well as the fundamental rights of the taxpayer, are entirely on his side.

Section 9 does not afford the taxpayer due process, and is therefore void. (*Porter v. City of Lewiston*, 41 Ida. 324, 238 Pac. 1014; *Chambers v. McCollum*, 47 Ida. 74, 272 Pac. 707.)

Judgment affirmed; costs to respondent.

Lee, C. J., and Varian, J., concur.

LEEPER, J., Dissenting.—I am unable to concur in the majority opinion. I dissent from the conclusion and I disagree as to the reasoning employed. Briefly stated, the position advanced by the majority is this: That the imposition of this tax constitutes a violation of the due process clause of the federal and state Constitutions because of lack of notice, both to taxpayers within the improvement district and taxpayers without the improvement district; as to the former, because the notice given in the original assessment proceedings provided only for a special limited imposition, which is unlawfully increased by this general tax without any further notice; as to the latter, because no notice of any kind has ever been given to him, either as to the imposition of the original assessments or as to the levying of the general tax here complained of. No such contention has been advanced by the respondent.

It is quite true that there may be offense against the Fourteenth Amendment of the Federal Constitution, depending upon the conclusion reached as to whether the purpose for which this tax is raised is public or private. If the latter, the levy and collection of it amounts to a taking of property without due process. (McGehee on Due Process of Law, p. 228; *Fallbrook Irr. Co. v. Bradley*, 164 U. S. 112, 17 Sup. Ct. 56, 41 L. ed. 369; *Green v. Frazier*, 253 U. S. 233, 40 Sup. Ct. 499, 64 L. ed. 878.) There are other factors which, if present, might contravene due

process, such as extraterritorial taxation, arbitrary and oppressive methods of levy and collection, unjust and illegal discrimination, none of which appear in this action. All these, however, are matters entirely apart from the question of notice.

The tax here complained of was duly and regularly levied, by authority of a validly enacted ordinance. The incidence of it is upon all property within the city, ratably and according to value, in full compliance with the Constitution of Idaho. It was levied exactly as all other taxes are levied, without discrimination as to persons and property. There is no contention that it is spoliatory or confiscatory.

It may be conceded without further discussion that some form of notice and consequent opportunity to be heard must be given to property owners within a special improvement district before special improvement assessments can be imposed, else there is infringement of the due process clause as to such property owners. There is no suggestion that this notice was not properly given in the first instance to property owners within Improvement District No. 28, and persons outside of the district were not entitled to notice. It does not follow that notice must be given of general tax proceedings undertaken by a municipality, other than adhering to the methods prescribed by law, i. e., assessment, publication of estimates and enactment of the revenue ordinance. (C. S., secs. 4053–4055.) There has been a misapprehension of the applicability of the due process clause in this connection. (Cooley on Taxation, 4th ed., sec. 143, p. 332.) As stated by McGehee in his work on Due Process, at page 238:

"Statutes imposing general taxes usually provide for an annual levy and fix the time within which the assessment shall be made, a specific time and place for the equalization of the assessment and the levy of the tax, a time within which the amount of the tax shall be placed in the tax books, a specific time for the tax books to be delivered to the collector or treasurer, and a specific time for the tax to become a lien on the property taxed, and this is

enough to constitute due process of law.''—and it is conceded that none of these requirements have been offended in the instant case.

The term ''due process'' is synonymous with ''law of the land'' (*Hagar v. Reclamation District*, 111 U. S. 701, 4 Sup. Ct. 663, 28 L. ed. 569), and what would be due process if done under the taxing power is not necessarily due process if done under some other power. (*Bell's Gap R. R. Co. v. Pennsylvania*, 134 U. S. 232, 10 Sup. Ct. 533, 33 L. ed. 892.)

If the tax is within the power of the legislature, then there is no violation of the due process clause provided it is levied according to law. This is due process. (*McCray v. United States*, 195 U. S. 27, 1 Ann. Cas. 561, 24 Sup. Ct. 769, 49 L. ed. 78.) Nor is it necessary that notice be given of every step in the process of taxation.

''Taxes have not, as a general rule, in this country since its independence, nor in England before that time, been collected by regular judicial proceedings in a court of justice. The necessities of government, the nature of the duty to be performed, and the customary usages of the people, have established a different procedure, which, in regard to that matter, is and always has been due process of law.'' (*Kelly v. Pittsburgh*, 104 U. S. 78, 26 L. ed. 658.)

See, also, *Brushaber v. Union Pac. R. R. Co.*, 240 U. S. 1, Ann. Cas. 1917B, 713, 36 Sup. Ct. 236, 60 L. ed. 493, L. R. A. 1917D, 414.

With reference to the position of the taxpayer within the district, nothing is advanced in the majority opinion other than the alleged violation of the due process clause, which, for the reasons I have stated, is in my opinion untenable. It may be well, however, to consider his position with reference to the equal protection clause, the one most often referred to in the adjudicated cases. The question is, Can a taxpayer whose property has been assessed for benefits in a special improvement district be taxed generally *ad valorem* with all other owners of property within the municipality to guarantee deficits resulting from non-

payment of other assessments within the district? In this connection the inherent difference between special assessments and general taxes must be kept in mind.

"A 'tax' is an enforced burden of contribution imposed by sovereign right for the support of the government, the administration of the law, and to execute the various functions the sovereign is called on to perform. A 'special assessment' is like a tax in that it is an enforced contribution from the property owner; it may possess other points of similarity to a tax, but it is inherently different and governed by entirely different principles. It is imposed upon the theory that that portion of the community which is required to bear it receives some special or peculiar benefit in the enhancement of value of the property against which it is imposed as a result of the improvement made with the proceeds of the special assessment. It is limited to the property benefited, is not governed by uniformity, and may be determined legislatively or judicially." (*Klemm v. Davenport,* 100 Fla. 627, 70 A. L. R. 156, 129 So. 904.)

The levy of this general tax, even though its incidence falls partially upon property within the improvement district already assessed, is something entirely separate and distinct from the original assessment, and its imposition does not contravene any constitutional inhibitions, provided the purpose can be construed to be public. Nor can it be said that such an imposition constituted a change in the basis of assessment, since it rests on different considerations.

"In the light of the foregoing authorities, it seems settled law in this country that an *ad valorem* tax and special assessment, though cognate in immaterial respects, are inherently different in their controlling aspects, that both may be imposed on the same property at the same time, and that in addition to the primary imposition in either instance the taxpayer may be required to pay an additional amount to make up deficiencies caused by the neglect or inability of other taxpayers to pay their assessments, and that such requirements would not violate constitutional inhibitions against double taxation, the requirement of

equality and uniformity, nor do they amount to taking one's property without due process." (*Klemm v. Davenport, supra.*)

The rule is sustained in *Trigg v. Henderson Cotton Mills*, 177 Ky. 613, 197 S. W. 1074, *Colby v. City of Medford*, 85 Or. 485, 167 Pac. 487, *United States v. Fort Scott*, 99 U. S. 152, 25 L. ed. 348, *Village of Hyde Park v. Ingalls*, 87 Ill. 11, *County of Redwood v. Winona & St. Peter Land Co.* (*State v. Certain Lands in Redwood County*), 40 Minn. 512, 42 N. W. 473, *City of Wilmington v. Cronly*, 122 N. C. 383, 30 S. E. 9, *Anderson v. Ritterbusch*, 22 Okl. 761, 98 Pac. 1002, and *State v. Holt County Court*, 135 Mo. 533, 37 S. W. 521; and this court has recognized it in *American Falls Reservoir District v. Thrall*, 39 Ida. 105, 228 Pac. 236.

In most of these cases the municipality was originally liable, directly or indirectly, for the debt, which would be an effective distinction when it comes to determining the question as to whether the purpose of the taxation is public or not. They are clearly authoritative, however, upon the immediate proposition to which they are cited, i. e., that the imposition of this tax, in and of itself, does not violate the constitutional inhibitions against double taxation, or the requirements of equality, uniformity and due process, as to property owners within the district. It is presumed that they benefit equally with all other owners within the municipality, and the benefits they receive are not those pertaining to their property on account of the original improvement, but rather are those flowing to all citizens from the satisfaction of a municipal, public purpose, which I will hereafter discuss.

There is a suggestion in the majority opinion that there is some duty or obligation owing by the municipality to the property owner within the district whereby it is prohibited from levying this tax, the exact nature of which duty or obligation is not stated. Clearly such contention cannot be upon the theory of contract. "A special benefit assessment is a proceeding *in invitum*, and is not based upon a contract. . . . . The assessment is a forced charge

imposed upon the property by the sovereign power of the state, and its validity does not depend upon any theory of contract between the property owner and the public.'' (*Colby v. City of Medford, supra.*)

I therefore proceed to consider the only matter essential to a proper determination of this case, and the only one presented by counsel, that is, the legality of the purpose for which this tax was levied. In other words, is the guarantee of defaulted special improvement bonds, issued before the enactment of the guarantee act in 1929, a public purpose for which taxes can be legitimately imposed? It seems to me that a proper consideration of this matter is of much broader scope than has been indicated by counsel. The question is directly raised by the plaintiff, respondent here, who charges a violation of the Fourteenth Amendment of the Federal Constitution, and of section 4, article 8, of the Idaho Constitution, basing the charge upon the allegation that the purpose is not public, but private.

Sess. Laws 1929, chap. 134, p. 219, purports to grant to cities and villages the power to use municipal funds, raised either by taxation or bond issue, or derived from other proper sources, for the purpose of guaranteeing to the extent of the fund therefor, provided the payment of bonds and warrants thereafter or theretofore issued against public improvement districts. Substantially, the law provides for the creation of a revolving fund, out of which any deficiency on the annual instalments due on such bonds arising out of the failure of certain included property to respond is to be paid in the first instance. It further contemplates that the securities so paid shall inure to the benefit of the fund and that such security shall be realized upon in due course and the fund replenished to that extent. If, however, the security absolutely fails, the loss must of necessity fall upon the guarantee fund. The tax paid for such purpose is limited to one mill per year.

The contention of respondent is very clear—that the levy of this tax is for the benefit of the holders of bonds issued before this law went into effect, and that these

bonds are by law and by their express terms not obligations of the city, that there is no resulting benefit to the city and its general public, and that therefore the law offends both the Fourteenth Amendment of the Federal Constitution, and section 4, article 8, of the Idaho Constitution. Appellant urges that the purpose is public, that there is such a moral and equitable obligation and future benefit arising from the rehabilitation of the city's credit as will sustain the levy, and that there is no resultant constitutional offense.

This law was enacted pursuant to the terms of section 6, article 7, of the Idaho Constitution, which provides:

"The legislature shall not impose taxes for the purpose of any county, city, town or other municipal corporation, but may by law invest in the corporate authorities thereof, respectively, the power to assess and collect taxes for all purposes of such corporation."

It is to be noted that the Idaho Constitution contains no provision requiring that taxes be levied for a public purpose, or anything of similar import. That, however, is necessarily implied, as the very foundation of the power to tax is the presence of a public purpose to be subserved by the expenditure for which the taxes are raised. (1 Cooley on Taxation, 4th ed., p. 381, sec. 174.) As concerns municipal taxes, in addition to being delegated for public purposes only, they can only be delegated for corporate purposes. That is to say, a municipality can only levy taxes which subserve a municipal, public purpose. (6 McQuillin on Municipal Corporations, 2d ed., p. 292, sec. 2532.)

Under our statutes relating to street improvements, the city has power in the first instance to pay all or any part thereof out of general funds, and within limits can levy an annual tax for that purpose. The city council could, both under the former statutes and the later act of 1927, in its discretion, and subject to certain restrictions, pay for such improvement out of general funds, or it could require the cost to be paid entirely by special assessments levied upon abutting property, or it could pay part of the cost out of general funds and require the balance to

be paid by special assessments. (C. S., chap. 163. See particularly sections 3942–3944 and 4005, these being the laws in force prior to 1927.) C. S., sec. 3942, was amended by Sess. Laws 1929, chap. 122, p. 202, and C. S., sec. 3944 and chap. 163, art. 6, were repealed and replaced by Sess. Laws 1927, chap. 257. Under the former law there is some doubt as to whether the city could expend general funds in the building of sidewalks or could pay for them otherwise than by special assessments upon abutting property. This doubt arises from discrepancies between C. S., secs. 3942, 3943 and 3944. However, the provisions of C. S., sec. 4005, would seem broad enough to authorize the city to expend general funds in this behalf. The 1927 act makes this certain. (*Byrns v. City of Moscow,* 21 Ida. 398, 121 Pac. 1034.)

In creating Improvement District No. 28, however, the mayor and city council of Pocatello required the entire cost thereof to be paid by special assessments levied against the various parcels of land included therein. Upon the confirmation of the assessment-roll each individual charge became fixed and bonds were subsequently issued, which were, by reason of the statutes, as construed by the decisions of this court, not general obligations of the City of Pocatello. (*Moore v. City of Nampa,* 18 Fed. (2d) 860; *New First National Bank of Columbus v. City of Weiser,* 30 Ida. 15, 166 Pac. 213.) This was embodied in a proviso written into the face of the bond, and the holders thereof acquired no legal claim or demand whatever against the City of Pocatello for reimbursement, but are compelled to look solely to the divisible liability of each parcel of land within the district for payment. The bonds are not liens against the property of the district as a whole, but only in the specific amount confirmed against each separate parcel.

After the issuance of the bonds certain parcels of property within the district defaulted in the payment of assessments, and there were annual delinquencies in varying amounts. Pursuant to the legislation aforesaid, the mayor and city council of Pocatello enacted Ordinance No. 754,

which by its terms imposed a tax for the creation of a fund to guarantee payment of the defaulted bonds of the district. The implication arising from this ordinance is that the legislative body of the city thereby declared and decided that the purpose was corporate and public, and in the exercise of legislative discretion so assessed the tax. We must also assume that the legislature, in enacting C. S., chap. 163, decided that the power thereby granted to cities and villages was for a public purpose.

Ordinarily the legislative declaration of purpose is conclusive.

" 'To justify a court in declaring a tax invalid on the ground that it was not imposed for the benefit of the public, the absence of a public interest in the purpose for which the money is raised by taxation must be clear and palpable as to be immediately perceptible to every mind.'

" 'It is also agreed that the determination of what is and what is not a public purpose belongs in the first instance to the legislative department. It belongs there because the taxing power is a branch of the legislative (department), and the legislature cannot lie under the necessity of requiring the opinion or the consent of another department of the government before it will be at liberty to exercise one of its acknowledged powers.' " (*Bevis v. Wright,* 31 Ida. 676, 175 Pac. 815, 816.)

Respondents rely upon the case of *Stanley v. Jeffries,* 86 Mont. 114, 70 A. L. R. 166, 284 Pac. 134, wherein the supreme court of Montana upheld a substantially identical statute in its prospective operation, but held it unconstitutional when applied retrospectively to bonds issued before its enactment. In this opinion the supreme court of Montana reiterated the rule "what is for the public good and what are public purposes are questions which the legislature must decide upon its own judgment," but held that in its opinion the purpose of the law was private, i. e., the reimbursement of bondholders for losses sustained, and that the rehabilitation of the city's credit was secondary and that it was *doubtful* if such a purpose existed at all.

This, of course, is a matter of opinion, the state legislature and the city council believing one way and the court the other. The weakness of the position of the Montana court is twofold: It intrudes into the legislative function and it ignores the vast field of precedent underlying the assumption of moral and equitable obligations by the state. Nor is it possible for me to reconcile the holding in this case with the prior declaration of the same court in *Mills v. Stewart*, 76 Mont. 429, 47 A. L. R. 424, 247 Pac. 332, where the court upheld an appropriation by the state legislature in the sum of $7,500 to compensate a student at the state university for damages suffered by him on account of falling through an exposed elevator shaft. Certainly as much private benefit resulted from one appropriation as from the other, yet in this case the same court, in passing upon the same constitutional requirements, upheld the appropriation.

The court in *Stanley v. Jeffries, supra,* expresses doubt as to the existence of a public purpose, then resolves that doubt against the state, contrary to the settled rule of statutory construction repeatedly announced by that court. In any event, *Stanley v. Jeffries, supra, Mills v. Stewart, supra,* and *State v. Dixon,* 66 Mont. 76, 213 Pac. 227 (the bonus case), seem to be in hopeless conflict as to the principle involved.

Let us apply the principles announced in *Mills v. Stewart, supra,* to the one in hand. In the first instance the city could have assumed all or any part of the expenditure represented by these bonds, and taxes could have been levied for this purpose. The improvement paid for by the funds derived from these bondholders was a benefit to the entire municipality and is now used by the general public. The means provided for payment of the bonds has to some extent been impaired, and the city by enacting Ordinance No. 754 has declared that it is for the best interests of the municipality to provide this limited guarantee fund to facilitate collection and lessen the amount of loss suffered by bondholders and thus maintain the credit of the city.

Certainly, there is no legal liability against the city. It is likewise true that the bonds are a contract, by the terms of which the bondholders agree to look only to the property for reimbursement. The city as a whole, however, and the inhabitants thereof, have received some measure of benefit from the funds borrowed from these bondholders, and it seems to me that there exists such a moral or equitable obligation as will sustain the assumption of liability by the city after the bonds are issued. The term moral or equitable obligation in this connection has a special significance. In the case of *State ex rel. McPherron v. Carter,* 30 Wyo. 22, 28 A. L. R. 1089, 215 Pac. 477, the supreme court of Wyoming, adopting the language of *Hagler v. Small,* 307 Ill. 460, 138 N. E. 849, said:

" 'It is of the essence of a moral obligation that it arise out of a state of facts appealing to a universal sense of justice and fairness, though on such facts no legal claim can be based. The state may be said to owe a moral debt to an individual when his claim grows out of the principles of right and justice. When it is of such a nature as to be binding on the conscience or honor of an individual, it may be said to be based upon considerations of a moral or honorary nature of which the state may take cognizance. Payments to individuals in the nature of a gratuity yet having some features of a moral obligation to support them have been made by Congress since the foundation of the government.' "

In this case the court upheld an appropriation in favor of the wife of a deceased sheriff, slain in line of duty, and in so doing stated *"that there is no distinction between the right to raise money for a specific object yet to be accomplished and a right to raise it to defray the expense of the same object after it has been attained,"* and that this *"is at least one of the criteria by which we can judge whether or not the obligation is a moral one."*

Another case closely defining the term "moral and equitable obligation" and distinguishing "gift or donation" therefrom is *Fairfield v. Huntington,* 23 Ariz. 528, 22 A. L. R. 1438, 205 Pac. 814.

"It has long been recognized that the legislature might not only settle legal claims, but those of a moral or equitable character as well. A moral obligation may be described as one which an honorable man ought to meet regardless of whether it is legally binding or not. The test is if a man of average conscientiousness would consider himself morally bound to make the payment under the same circumstances." (Mott on Due Process of Law, p. 513; 26 R. C. L., sec. 45, p. 64; 19 R. C. L., sec. 32, p. 724.)

The field of inquiry is so broad as to permit only of mention. Recent bonus legislation in favor of veterans has been sustained in every state but two where the issue has arisen. (*State v. Clausen,* 113 Wash. 570, 13 A. L. R. 580, 194 Pac. 793; *Hagler v. Small,* 307 Ill. 460, 138 N. E. 849; *State v. Handlin,* 38 S. D. 550, 162 N. W. 379; *State v. Johnson,* 170 Wis. 251, 176 N. W. 224; Id., 170 Wis. 218, 175 N. W. 589, 7 A. L. R. 1617, and complete note; *Gustafson v. Rhinow,* 144 Minn. 415, 175 N. W. 903; *State ex rel. Griffith v. Davis,* 113 Kan. 4, 213 Pac. 171; *Opinion of the Justices,* 211 Mass. 608, 98 N. E. 338; *Franklin v. State Board of Examiners,* 23 Cal. 173; *Veterans' Welfare Board v. Jordan,* 189 Cal. 124, 22 A. L. R. 1515, 208 Pac. 284; *Veterans' Welfare Board v. Riley,* 188 Cal. 607, 206 Pac. 631; *Allied Architects' Assn. v. Payne,* 192 Cal. 431, 30 A. L. R. 1029, 221 Pac. 209.)

The supreme court of New York in *People v. Westchester County Nat. Bank,* 213 N. Y. 465, 15 A. L. R. 1344, 132 N. E. 241, with Justice Cardoza dissenting, and the supreme court of Montana in *State v. Dixon, supra,* following the New York court, denied the validity of bonus legislation, upon the ground that the moral obligation rested upon the federal government and not the state, and that the appropriation offended the constitutional clause prohibiting gifts and donations, this conclusion being contrary to that reached by the California court under the same Constitution. In neither of these cases was there mention of due process, but it would seem that the reasoning involves that concept also. Both concede that a public purpose exists. For

a general review of litigation affecting bonus legislation, see Mott on Due Process of Law, p. 521. Appropriations for the following purposes have been sustained: for beneficial services rendered to the state (*Cole v. State,* 102 N. Y. 48, 6 N. E. 277); for property furnished the state (*O'Hara v. State,* 112 N. Y. 146, 8 Am. St. 726, 19 N. E. 659, 2 L. R. A. 603); where the state received money for land, the title to which was defective (*Wheeler v. State,* 190 N. Y. 406, 123 Am. St. 555, 83 N. E. 54); for work done in replacing a railroad bridge (*LeHigh Valley Ry. Co. v. Canal Board,* 204 N. Y. 471, Ann. Cas. 1913C, 1228, 97 N. E. 964). The federal government has long recognized the principle. (*United States v. Realty Co.,* 163 U. S. 427, 16 Sup. Ct. 1120, 41 L. ed. 215.)

California has in certain cases denied that moral and equitable considerations are adequate to sustain legislative appropriation (*Stevenson v. Colgan,* 91 Cal. 649, 25 Am. St. 230, 27 Pac. 1089, 14 L. R. A. 459; *Bourn v. Hart,* 93 Cal. 321, 27 Am. St. 203, 28 Pac. 951, 15 L. R. A. 431; *Conlin v. Board of Supervisors,* 99 Cal. 17, 37 Am. St. 17, 33 Pac. 753, 21 L. R. A. 474; Id., 114 Cal. 404, 46 Pac. 279, 33 L. R. A. 752), under the constitutional proviso declaring that the legislature shall not have power ''to make any gift, or authorize the making of any gift, of any public money or thing of value to any individual, municipal or other corporation whatever.'' The courts of Montana, Wyoming and Arizona, with identically the same constitutional provision, have definitely refused to follow California, in the cases heretofore discussed, and such does not seem to be the general rule.

In the face of this holding the supreme court of California has sustained all bonus and other veteran relief legislation, from the earliest times, on the ground that it subserves a public purpose. (*Franklin v. State Board of Examiners, supra; Veterans' Welfare Board v. Riley, supra; Veterans' Welfare Board v. Jordan, supra; Allied Architects' Assn. v. Payne, supra.*) It has also sustained appropriations to provide for compensation for animals slaughtered by the state (*Patrick v. Riley,* 209 Cal. 350,

287 Pac. 455); to pay bounties for the destruction of coyotes (*Ingram v. Colgan*, 106 Cal. 113, 46 Am. St. 221, 38 Pac. 315, 39 Pac. 437, 28 L. R. A. 187); to pay police pensions (*O'Dea v. Cook*, 176 Cal. 659, 169 Pac. 366); to pay for free text-books (*MacMillan Co. v. Clarke*, 184 Cal. 491, 17 A. L. R. 288, 194 Pac. 1030). Thus California seems to have ultimately arrived at the conclusion that it will sustain grants to private persons, providing it can discern some continuing future benefit arising therefrom in favor of the general public, slight though it may be.

Prior to 1879 California had a Constitution somewhat similar in scope to our own. It did not then contain the prohibitions against gifts or donations. In a series of cases under the old Constitution the supreme court of California upheld grants based upon moral and equitable considerations. (*Blanding v. Burr*, 13 Cal. 343; *Beals v. Amador County*, 35 Cal. 624; *Sinton v. Asbury*, 41 Cal. 525; *Creighton v. San Francisco*, 42 Cal. 446; *Hoaglund v. Sacramento*, 52 Cal. 142.) *Creighton v. San Francisco*, *supra*, is particularly in point here.

"The admitted fact here that Creighton had performed labor in the improvement of the public street, and of which the municipal government and people of San Francisco had the benefit, and that he had been unable to obtain compensation therefor, only because the principal officer of the municipal government had neglected to observe the statute requiring him to sign his name to the resolution under which the work was done, presented a case fully as persuasive in its circumstances as most of those which have been the subject of legislative relief in this State or elsewhere." (*Creighton v. San Francisco*, *supra*.)

Plaintiff alleges a violation of section 4, article 7 of the Idaho Constitution, prohibiting the lending or pledging the faith or credit of the city in aid of any individual, association or corporation, or becoming responsible for any debt, contract or liability thereof. This constitutional proviso is coextensive with the law that taxes can be imposed for a public purpose only. In Montana, where the latter rule is in the Constitution, the supreme court has

said: ''Thus the two quoted constitutional provisions are directed toward the same prohibited action, and if the act under consideration is not violative of the one, it is not violative of the other.'' (*Stanley v. Jefferies, supra.*) Inasmuch as no debt is created by the ordinance in question, because it provides for the tax levy in advance of the appropriation, it would seem that there is no lending or pledging of the faith or credit of the city in the constitutional sense. (*Veterans' Welfare Board v. Riley, supra.*) As stated in *Atkinson v. Board of Commrs.*, 18 Ida. 282, 108 Pac. 1046, 28 L. R. A., N. S., 412, the prohibition of this section is primarily directed against the combination of public funds or credit with the capital of any other person. Obviously no such condition exists here, as the obligation sought to be paid is a public obligation in the first instance, even if not corporate, and the city is not paying the debts of any individual. Rather it is assuming a wider liability for a public debt, originally restricted in its incidence to certain specified property. The whole question resolved itself into a consideration as to whether this is a private or a public purpose.

There is no prohibition whatsoever in the Idaho Constitution inhibiting a legislative grant based upon a moral and equitable consideration, arising from past benefits accrued to the state or an obligation which it may justly assume. For this reason the earlier California cases are more nearly in point than are the later ones. A perusal of our session laws indicates that the state legislature has repeatedly made appropriations in favor of private individuals whose obligation against the state was not a legally enforceable claim. I refer, for example, to the appropriation in favor of Eva Steunenburg, wife of the assassinated former Governor, and to veterans' relief legislation. Practically every other jurisdiction including the federal government recognizes in some degree that a moral and equitable obligation is sufficient to sustain an appropriation, without regard to the prospective public benefit. These jurisdictions also hold with practical unanimity that the legislature is vested with discretion to determine

whether such an obligation exists, and in the absence of clear and palpable abuse that discretion will not be interfered with by the court. This court has already expressly recognized that an appropriation to discharge a moral obligation for past benefits accrued and of necessity further to accrue is valid in the case of *Gem Irr. Dist. v. Gallet*, 43 Ida. 519, 253 Pac. 128, wherein an appropriation by the state to pay past due obligations of the Gem Irrigation District was sustained.

In the light of this authority, how can the existence of a moral and equitable obligation adequate to sustain this legislative grant of power and the municipal appropriation be denied? The money was originally loaned by the bondholders to subserve a public purpose, i. e., the construction of street improvements. The means provided for repayment has partially failed. The city had in the first instance the power to appropriate general funds to pay all or any part of the improvement. There is no legal obligation whatsoever against the city, but nevertheless the fact remains that the city and the inhabitants thereof have received and retain public improvements paid for by the bondholders' money. "All public improvements constructed within special improvement districts must necessarily benefit the entire city." (*Stanley v. Jeffries, supra.*) The gist of the whole question is that the city as a whole has received a benefit from the bondholders' money, and if a portion of this is repaid voluntarily by the city, the payment cannot be said to be a pure gift or donation, void under the rule prohibiting appropriations for private purposes.

Every reported case in which similar laws have been attacked have sustained the legislation in its prospective operation, including *Stanley v. Jeffries, supra,* the case relied upon by plaintiff. Quoting from the latter:

"When, therefore, the Legislature provided that, as to special improvement districts created in the future, a fund shall be created to insure the prompt payment of bonds and warrants issued in payment of such improvements, it but modified the special improvement district law to impose

upon the general public, within the municipality, a conditional obligation to pay a small portion of the cost of erecting the public improvement, whereas it might have, lawfully, imposed a much greater burden upon the municipality.''

In the case of *Comfort v. City of Tacoma,* 142 Wash. 249, 252 Pac. 929, the court upheld a similar law and an appropriation thereunder in these words:

''The city had the right to initiate local improvements and to pay the whole cost thereof out of general taxes. This tax is imposed on all alike, and is general in its application. A benefit accrues to every property owner because the additional guaranty of the bonds is reflected naturally in the increased price at which the bonds sell, thereby reducing the cost of all improvements. In time every property owner will come within some improvement district either for original improvements or for new improvements to take the place of those worn out or obsolete, and thus receive a benefit at that time by reason of the increased value of the bonds.''

So, also, has the supreme court of Utah approved the law in *Wicks v. Salt Lake City,* 60 Utah, 265, 208 Pac. 538, and in *Deseret Savings Bank v. Francis,* 62 Utah, 85, 217 Pac. 1114, the court upheld the law, both prospectively and retrospectively, as to the latter on the ground that the legislature had the inherent power to enlarge the liability of the city after the warrants were issued, in these words:

''By the terms of the statute the guarantee fund is provided for the payment of bonds and warrants issued and outstanding before, as well as those issued after, the passage of the act. Notwithstanding the liability of the city for the payment of plaintiff's warrants at the time of their issue was special and limited, it was within the lawful power of the legislature to enlarge that liability. The cases are numerous where statutes creating liability upon transactions where no vested right or legal liability existed before, have been sustained. In *New York Life Ins. Co. v. Board of Commissioners,* 106 Fed. 123, 45 C. C. A. 233,

the subject is elaborately discussed, and an exhaustive review of the cases made.''

Another case quite analogous is *State ex rel. American Savings Union v. Wittlesey,* 17 Wash. 447, 50 Pac. 119, wherein the supreme court of Washington upheld a law requiring municipalities to guarantee the repayment of amounts paid for a tax certificate later found to be void, and the court further found that the law applies to certificates issued for taxes due prior to the enactment of the law. The holding is upon the broad general theory that, ''unless restrained by the Constitution, the legislature may direct the restitution to taxpayers of property exacted from them by taxation,'' nor is such a law void, because retrospective.

Along similar lines is *Lyman v. Chase,* 178 Minn. 244, 226 N. W. 633, where the state assumed responsibility for a large amount of county drainage bonds, improvidently issued and later defaulted because of failure of lands within the drainage districts to respond. The state took over much of the lands within the drainage districts, and in sustaining the appropriation the court said:

''Under this situation it would seem that there is at least a moral obligation for the state to come to the rescue of a governmental agency upon which it ill-advisedly imposed a state burden, which, through no fault of the agency, would spell its financial ruin. It may also be noted that the unredeemed lands appropriated by the state for the preserve, were subject to these assessments for the payment of the drainage bonds, and, when the state now takes the same for a perpetual use, it would seem equitable and proper that it assume such assessments as the act prescribes, and also that, in consideration thereof, the county protect the bonds of school districts and townships as therein provided. That relief to these three counties is a public purpose, justifying the law in question, is supported by such cases as *Sacramento & San Joaquin Drainage Dist. v. Riley,* 199 Cal. 668, 251 Pac. 207; *Kinney v. City of Astoria,* 108 Or. 514, 217 Pac. 840. And as cases where a public purpose sustains a state appropriation and taxation, although individuals are benefited, may be

cited *Gustafson v. Rhinow,* 144 Minn. 415, 175 N. W. 903; *Hagler v. Small,* 307 Ill. 460, 138 N. E. 849.''

Exactly the same reasoning will apply in the instant case. The improvement district is merely an instrumentality of the state to provide for the levying of special assessments, and if the burden has been placed inadvisedly, certainly no injustice is done if the city voluntarily comes to the rescue of this instrumentality which it created for public purposes.

The possibility of continuing public benefit, aside from the moral and equitable obligation involved, cannot be summarily dismissed, as was done by the Montana court. The law provides upon its face for the creation of a revolving fund, which if called upon to pay shortages in the annual instalments due was to receive and acquire the bonds so paid and succeed to the incident security. In substance the law contemplates a loan of the guarantee fund, and subsequent replacement by realization on the security, i. e., foreclosure of delinquent assessments. Loss is not contemplated in the first instance, although it may result. The operation of the law will be to facilitate the payment of the bonds. (*Comfort v. City of Tacoma, supra.*) Nor am I able to say that the guaranteeing of past as well as future obligations will not to some extent rehabilitate the city's credit, or that the manifestation of such intent will not in the future maintain a higher price level, lower interest rates and render money more readily available for improvements. These are matters for the legislature and the city council to consider, and not the courts. The fact that private individuals incidentally and greatly benefit by the transaction is not material, unless it appears beyond cavil of dispute that no public purpose is being subserved by the appropriation. I cannot say that this is the case here, and to hold the law obnoxious on that ground constitutes a clear invasion of the legislative prerogative and a distinct violation of the constitutional division of governmental powers. (Const., art. 2, sec. 1.)

Neither the wisdom of the law conferring the authority or the appropriation by the city council, nor the motives

of legislative officials, can be considered by us. (*Diefendorf v. Gallet,* 51 Ida. 619, 10 Pac. (2d) 307.)

Clearly the legislature may authorize the city to guarantee these bonds, prospectively and retrospectively, in its discretion, and the city may appropriate within the terms of the authorizing statute. There also exists the possibility of future continuing public corporate benefit which, while intangible, would be sufficient to sustain the legislation if the legislature so assumed. That is, the absence of public purpose is not so plain and palpable as to render the appropriation on its face obviously for private purposes. The legislature having conferred upon the city power to make such appropriation, and the city having so done, the legislative bodies recognized the moral and equitable nature of the obligation and the incident public benefit, and it is not for this court to say that these factors do not exist and that such acts are unconstitutional. The implications of such a holding go far beyond the instant case. I am convinced that this court has no right to substitute its judgment upon such matters for that of the legislature. Far too often for the public good have courts, under one guise or another, trenched upon the legislative domain.

The judgment should be reversed.

Mr. Justice Budge dissents from the majority opinion and concurs in the dissenting opinion of Mr. Justice Leeper.